1  Matthew G. Monforton, Esq.  (CA State Bar No. 175518)
2  Monforton Law Offices, PLLC
   32 Kelly Court
3  Bozeman, Montana 59718
4  Telephone:  (406) 570-2949
   Facsimile:  (406) 586-3869
5  E-mail:     matthewmonforton@yahoo.com
6
7  Attorneys for Plaintiffs

8              UNITED STATES DISTRICT COURT
9
10           CENTRAL DISTRICT OF CALIFORNIA

11

12  ONE UNNAMED DEPUTY                )
    DISTRICT ATTORNEY;                )  Case No._____
13  ASSOCIATION OF DEPUTY             )
    DISTRICT ATTORNEYS, a Los         )  CV09-7931  GW (SSx)
14  Angeles County Employee           )
15  Organization,                     )  COMPLAINT FOR DAMAGES,
                                       )  INJUNCTIVE RELIEF, AND
16              Plaintiffs,            )  DECLARATORY RELIEF
                                       )
17        v.                          )
                                       )
18  COUNTY OF LOS ANGELES;            )
19  STEVE COOLEY, individually        )
    and in his official capacity;     )  DEMAND FOR JURY TRIAL
20  CURTIS HAZELL, individually       )
21  and in his official capacity, JOHN)
    SPILLANE, individually and in his )
22  official capacity; JOHN ZAJEC,    )
    individually and in his official  )
23  capacity; JACQUELYN LACEY,        )
24  individually and in her official  )
25  capacity, and DOES 1 - 10         )
                                       )
26                                     )
27              Defendants.            )
                                       )
28

**PRELIMINARY STATEMENT**

1.      This case arises from an anti-union policy implemented by Defendant Steven Cooley, the District Attorney of Los Angeles County, and his senior officials. They have called the president of the employees union representing deputy district attorneys a "crook."  Worse, they have declared that prosecutors who join the union are "ratifying dishonesty" and are "contaminated," thereby justifying "disastrous" career consequences for any such deputy.

2.      Remarkably, Defendants admitted in sworn testimony that they retaliate against prosecutors who join the union.  As described in detail below, the victims of Defendants' discriminatory policy are some of the best and brightest prosecutors in the District Attorney's Office.  Defendants' discriminatory acts include transferring senior union members to juvenile courts, assignments reserved for young, inexperienced prosecutors.  For more experienced prosecutors, such transfers amount to a career death sentence.  These assignments often involve substantial commutes from prosecutors' residences and are referred to by Defendants as "freeway therapy." Defendants are also retaliating against union-represented prosecutors by threatening to reduce their health care benefits beginning in January 2010.

3.      Defendants use District Attorney Investigators (*i.e.*, law enforcement officers working directly for Defendants) to harass and intimidate the union's most active members as well as their allies in the media, a practice harkening back to the kind of 19th Century thuggery commonly employed against union organizers.  On at least one occasion, DA Investigators have attempted to manufacture evidence that a heterosexual union board member engaged in homosexual conduct, a tactic they have employed against targets in other cases.

1

2

3        4.      Defendants' retaliation against the union's president has been especially

4  severe, involving numerous punitive transfers, an illegal suspension without pay and

5  inclusion of false allegations in his most recent performance evaluation.[1]

6

7        5.      Plaintiffs seek to exercise their First Amendment rights of speech and

8  association to engage in union-related activities without being subjected to

9  Defendants' policy of discrimination and intimidation.

10

11                          **JURISDICTION AND VENUE**

12        6.      This Court has subject matter jurisdiction over this case under 28

13  U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the

14  United States Constitution; under 28 U.S.C. § 1343(a)(3), in that Plaintiffs seek

15  redress for deprivations made under color of state law of rights, privileges, and

16  immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4),

17  in that Plaintiffs seek damages and equitable relief under 42 U.S.C. § 1983, which

18  provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b)

19  for an award of attorneys fees; under 28 U.S.C. § 2201(a) to secure declaratory relief;

20  and under 28 U.S.C. § 2202 to secure preliminary and permanent injunctive relief.

21

22

23  _____

24        [1] Punitive transfers, law enforcement harassment (including attempts to manufacture
25  evidence of homosexual conduct by heterosexual men), illegal suspensions, and false employee
    allegations are also par for the course for other deputies who exercise their First Amendment rights
26  in ways Defendants find displeasing.  See, *e.g.,* First Amended Complaint, ¶¶ 33, 59, 67-71, filed in
    *Eng v. County of Los Angeles, Steve Cooley, et al.* (C.D. Cal. Case No. CV 05-2686).  As detailed
27  below, Defendants sharply increased their reliance upon these practices after Plaintiff Association of
28  Deputy District Attorneys became a certified public employees union in March 2008.

3

1       7.    Venue is proper in the United States District Court for the Central

2   District of California under 28 U.S.C. § 1391(b), because the events giving rise to the

3   claims described in this Complaint occurred within Los Angeles County.

4

5                                 **PARTIES**

6       8.    Plaintiff Association of Deputy District Attorneys ("ADDA") is an

7   employee organization (*i.e.*, public employees union) formed in accordance with Los

8   Angeles County's Employee Relations Ordinance.  The Los Angeles County

9   Employee Relations Commission, the County agency that oversees employee relations

10  between the County and its public employees unions, certified ADDA as the official

11  representative for Los Angeles County Employees Bargaining Unit 801 in March

12  2008.  ADDA has approximately 300 deputy district attorneys as members and

13  Bargaining Unit 801 consists of deputy district attorneys in Grades I through IV.

14

15      9.    The other Plaintiff is currently a deputy district attorney in the DA's

16  Office and shall be referred to as the "Unnamed DDA." [2]  The Unnamed DDA is

17  eligible for ADDA membership but is not yet a member.  He/she intends to join

18  ADDA as a dues-paying member and become active in the organization's affairs once

19  there is an injunction preventing Defendants from discriminating against ADDA

20  members.  The Unnamed DDA resides in Los Angeles County.

21

22      10.    Defendant Los Angeles County is a municipal corporation and at all

23  times mentioned herein has been the employer of the Unnamed DDA.  The remaining

24  individual defendants, sued here in both their personal and official capacities, were at

25  all relevant times mentioned herein employees and/or agents of Los Angeles County.

26  _____

27      [2] The Unnamed DDA is suing anonymously in accordance with *Does I thru XXIII v.*
    *Advanced Textile Corp.,* 214 F.3d 1058, 1069-1071 (9th Cir. 2000).  He/she will soon file a motion

28  for leave to proceed by using a pseudonym.

11.     Defendant Steve Cooley is, and at all times herein mentioned was, the District Attorney for the County of Los Angeles.  He was first elected to office in November 2000.  His office has approximately 1,000 deputy prosecutors.  Defendant Cooley resides in the County of Los Angeles.

12.   Defendants Curtis Hazell, John Spillane, John Zajec, and Jacquelyn Lacey have been at all times pertinent to this action top ranking officials in the administration of Defendant Cooley.  Each of these Defendants has authority over promotions, demotions, transfers and discipline within the DA's Office and each has illegally discriminated against union members in matters pertaining to promotions, transfers, and discipline.  This policy of discrimination is described in detail below.

13.   Plaintiffs are informed, believe and thereon allege that at all relevant times herein, each of the fictitiously named defendants was an agent, employee or co-conspirator of one or more of the named defendants, and was acting within the course and scope of said agency or employment.  Plaintiffs are further informed, believe and thereon allege that each of the fictitiously-named defendants aided and assisted the named Defendants in committing the wrongful acts alleged herein, and that Plaintiffs' damages, as alleged herein, were proximately caused by such Defendants.

14.   Plaintiffs are informed, believe and thereon allege that Defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing such acts, acting pursuant to and in furtherance of said conspiracy, and each Defendant sued herein is jointly and severally responsible and liable to Plaintiffs for the damages alleged herein.

15.   Defendants, and each of them, and/or their agents/employees knew or

5

1   should have known that each of the remaining co-Defendants, individually and

2   together in varying combinations, was engaging in the conduct alleged herein.

3

4                                   **FACTS**

5

6                                     **1.**

7           **Admissions by Defendants Regarding Their Policy of**

8                **Discriminating Against ADDA Members**

9

10          16.     On March 24, 2008, Los Angeles County's Employee Relations

11  Commission ("ERCOM") certified ADDA as the employee organization recognized

12  to represent the deputy prosecutors of County Bargaining Unit 801.  Prior to this date,

13  ADDA was an entity that served primarily as a vehicle for social events for deputy

14  prosecutors.  After certification, ADDA became a full-fledged public employees union

15  with the same rights and responsibilities as any other County-recognized union.

16

17          17.     Shortly after ADDA's certification, ADDA Board Member Frank

18  Tavelman sent an email to Defendant Lacey requesting the DA's office state, in

19  writing, that it remains neutral regarding union issues and that it would refrain from

20  taking punitive action against any prosecutor for exercising his or her right to join

21  ADDA.  Defendant Lacey is a top Cooley Administration official and had served as

22  the ADDA's liaison with the Administration.

23

24          18.     Defendant Lacey told Tavelman that Defendants would not comply with

25  ADDA's request.  Rather than honor ADDA's request to take a neutral position,

26  Defendants implemented an office-wide policy of discriminating against ADDA

27

28

                                        6

1   members regarding promotions, demotions, and transfers.  This policy shall

2   hereinafter be referred to as Defendants' "Union Discrimination Policy."

3

4         19.    Shortly before October 17, 2008, Defendant Lacey met with Robert

5   Dver, a 24-year veteran prosecutor and, at that time, the Assistant Head Deputy of the

6   Training Division of the DA's Office.  The Training Division is responsible for

7   providing, *inter alia*, a one-month training seminar for all newly hired prosecutors,

8   followed by additional seminars during the first two years of new prosecutors' careers.

9   During their early years in the office, newly-hired prosecutors often look to their

10   trainers as mentors and routinely seek advice from them not only relating to cases but

11   also to office policies, both written and unwritten.

12

13         20.    Dver and Defendant Lacey were close friends prior to October 17, 2008.

14

15         21.    When they met, Dver told Defendant Lacey that he wanted to join

16   ADDA's Contract Negotiating Team, which was scheduled to begin negotiating with

17   Cooley's management team later in the year.  ADDA believed Dver would be a

18   significant asset to its team, as both ADDA's leadership and Defendants regarded

19   Dver as highly ethical and one of the best prosecutors in the DA's Office.

20

21         22.    Dver told Defendant Lacey that he wanted to join ADDA's Contract

22   Negotiating Team because he believed he could help achieve reasonable compromises

23   between ADDA and the Cooley Administration.  Dver intended to tell Defendant

24   Cooley of his decision and sought advice from Defendant Lacey as to how best to

25   approach him.  Dver was also friends with Defendant Cooley at that time - Cooley had

26   previously attended bar mitzvahs for Dver's children - and thought he should speak to

27   Cooley face-to-face about his decision.

28

23.    Defendant Lacey told Dver not to join ADDA's negotiating team and also told him not to even bring up the subject with Defendant Cooley.  To do so, she said, would be a "disaster" for Dver's career.

24.    Dver nevertheless met with Defendant Cooley on October 17, 2008 in order to discuss his decision to join ADDA's bargaining team.

25.    Defendant Cooley reacted to Dver's idea with disgust.  He told Dver that many of ADDA's members supported unionization as a result of Dver doing so and that ADDA had exploited Dver's reputation to aid its organizational activities.

26.    Defendant Cooley then slandered ADDA's President, Steve Ipsen, by referring to him as a "crook" and declared that the prosecutors who signed the union cards leading to ADDA's certification were "contaminated."

27.    Defendant Cooley had obtained a confidential list of ADDA members who signed union cards when one of his subordinates, Peter Burke, unlawfully obtained the list from ERCOM.  Immediately upon obtaining the list, Burke published it to unauthorized persons and attached it as an exhibit to a state court complaint he filed the day before Dver met with Defendant Cooley.

28.    Defendant Cooley instructed Dver to "undermine" ADDA since, according to Cooley, Dver had been responsible for ADDA's certification as a public

8

employees union.  Defendant Cooley further instructed Dver to team up with Burke and another deputy prosecutor, Tom Rubinson, in their efforts to undermine ADDA.[3]

29.    Dver was shocked by Defendant Cooley's anti-union animus and did not agree to his demand to "undermine" ADDA.

30.    After the meeting on October 17, 2008, Defendant Cooley transferred Dver out of the Training Division.  Defendant Cooley also demoted Dver from his position as Assistant Head Deputy and stripped him of his supervisory tasks.

31.    Dver never joined ADDA's bargaining team.  Plaintiffs are informed, believe, and thereon allege that Defendants' intimidation and harassment of Dver caused him to decline ADDA's offer to join its bargaining team.

32.    On July 9, 2009, Defendant Lacey testified under oath at a hearing and admitted that participation in ADDA, particularly its negotiating team, is detrimental to a deputy prosecutor's career.

33.    In response to questions posed by ADDA President Ipsen, who was representing himself at that hearing, Defendant Lacey elaborated upon Defendants' Union Discrimination Policy and her reasons for dissuading Dver from joining ADDA's bargaining team:

Q    …. Did you think it would be bad for [Dver's] career if he

_____

[3] The day before the meeting between Dver and Defendant Cooley, Burke filed a lawsuit in state court alleging irregularities in a recent ADDA election.  This suit is now on appeal.  Tom Rubinson now sits on the Los Angeles County Superior Court.

9

1         was closely allied with the Union, meaning it would lessen his

2         chance of getting promoted to Grade Five by Steve Cooley?

3

4      A.  No. In as much as if you were the President, --

5

6      Q.  Okay.

7

8      A.  -- Yeah,  I did.

9

10     Q.  And you believed that it would hurt his chances and hurt his

11         career if he did that while I was President?

12

13     A.  I definitely thought being associated with you would hurt him.

14

15     Q.  Or even with the Union while I was President?

16

17     A.  While you were President.

18

19     Q.  Would hurt him in the sense of hurt his career?

20

21     A.  Yes.

22

23     Q.  Why did you think that?

24

25     A.  I thought that because Mr. Cooley felt that you were

26         dishonest and felt quite frankly that anybody associated

27         with you would be ratifying or endorsing that dishonesty.

28

10

1

2      34.    Later in that same proceeding, Defendant Lacey admitted that "I felt that

3  it would be bad for [Dver] to be associated with the union with [Ipsen] at the

4  leadership."

5

6      35.    Defendants' Union Discrimination Policy is commonly known among

7  deputy district attorneys throughout Los Angeles County.

8

9

10                                        **2**

11     **Injuries Being Sustained by ADDA as a Result of Defendants'**

12     **Union Discrimination Policy**

13

14     36.    Defendants' Union Discrimination Policy has deprived, and is continuing

15  to deprive, ADDA and its members of their constitutional rights to freedom of

16  association and freedom of speech in numerous ways.

17

18     37.    For example, Defendants gave written notice to all deputy prosecutors

19  that, beginning in January 2010, the County will reduce the health care benefits of all

20  union-represented prosecutors in the DA's Office.

21

22     38.    Besides violating both federal and state law, Defendants' threats to

23  reduce health care benefits starting in January 2010 have hindered ADDA's ability to

24  recruit and retain members.

25

26     39.    As detailed in the remainder of this Complaint, Defendants have also

27  subjected ADDA members to punitive transfers, illegal suspensions, and intimidation

28

11

by armed DA Investigators.  They have called ADDA's president a "crook" and declared that all other members of ADDA have "ratif[ied] dishonesty" by joining the union.  These smears would damage the reputation of any attorney.  They are extraordinarily damaging to prosecutors, attorneys from whom the judicial system rightly demands the highest ethics.  More than simply insulting, the slandering of 300 ADDA prosecutors by the men and women who run the DA's office has created a moral stigma that, left undisturbed, will cause reasonable, non-member prosecutors to think twice before joining ADDA.

40.     In taking these actions, Defendants seek to chill ADDA's constitutional rights to freedom of association and freedom of speech by discouraging non-ADDA prosecutors, including the Unnamed DDA, from joining the union.  These actions are unlawfully undermining ADDA's representation of prosecutors in the DA's office and financially damaging ADDA by depriving it of dues-paying members who would join the union but for Defendants' illegal actions.

41.     Defendants also seek to chill ADDA's constitutional rights to freedom of association and freedom of speech by punishing those ADDA members, such as Dver, who desire to aid ADDA's Contract Negotiating Team.

42.     Another victim of this tactic is Hyatt Seligman, who is also member of ADDA's Contract Negotiating Team.  During a bargaining session this spring, Seligman questioned Defendants' denials that punitive transfers occur in the DA's office.  Defendants became so irate at having a deputy prosecutor dare to ask such a question that, two days later, Seligman found *himself* on the receiving end of one of those transfers.

12

43.    Defendants' illegal retaliation and threats of continued retaliation against highly respected prosecutors such as Dver and Seligman have deprived ADDA of valuable and persuasive persons to represent it in collective bargaining negotiations. Additionally, Defendants' retaliation against members of ADDA's Contract Negotiating Team in response to statements made in bargaining sessions has been intended to chill the team's ability to represent ADDA and its members.  The removal of Dver and Seligman from the Training Division has further injured ADDA by depriving newly-hired prosecutors of pro-union mentors, thereby reducing the chances that newly-hired prosecutors will make the mistake of "contaminating" themselves -- in the words of Steve Cooley -- by joining ADDA.

**3.**

**Application of the Union Discrimination Policy to Individual ADDA Members**

44.    Defendants have applied their Union Discrimination Policy against ADAA members, particularly members of ADDA's Board of Directors, who have actively sought to organize deputy district attorneys into a viable collective bargaining organization.  Examples of how Defendants apply their Policy are detailed below.

*ADDA President Steve Ipsen's Background:*

45.    DDA Steve Ipsen joined the Los Angeles County District Attorney's Office 1987.   He has been ADDA's President since February 2002 and also served on the Board of Directors for the State Bar of California from 2002 to 2005.  He is currently a Grade IV deputy.

13

46.     Until four months ago, Ipsen's supervisors had routinely rated him "Outstanding," the highest rating a deputy district attorney can receive on his or her performance evaluation ("PE").

47.     One of Ipsen's "Outstanding" PE's came in 1993 from his supervisor at the San Fernando Branch of the DA's Office.  This supervisor observed the following about Ipsen:

> Mr. Ipsen continues to accept the most difficult and complicated cases.
> He has achieved exceptional results in their prosecution.  He is willing
> to spend the time necessary to adequately prepare assigned cases.  He
> is diligent and hard working and thoroughly dedicated.  He is well
> liked by his peers and witnesses have confidence in his ability.  He has
> an enviable record of trial success.  His legal reasoning and judgment
> are sound.  His greatest strength lies in the fact that jurors like him.
> Mr. Ipsen remains an asset to this office and his skills will only
> improve with additional experience.

The supervisor expressing these comments was Defendant Steve Cooley who, in 1993, was the Head Deputy of the San Fernando Branch.

48.     Ipsen's prior supervisor in San Fernando, Billy Webb, congratulated Ipsen in Ipsen's 1991 PE for developing what Webb described as a "unique video process for presenting documentary evidence that generated accolades from judges, attorneys and expert witnesses alike."  Webb concluded his 1991 PE by noting that "[w]e have several top flight trial attorneys here in San Fernando.  [Ipsen] is one of the top two or three."

14

49.    After 1993, Ipsen moved to the Van Nuys Branch.  Philip Wynn, Ipsen's supervisor in Van Nuys, stated the following in Ipsen's 1996 PE:

> Mr. Ipsen is an outstanding trial attorney.  He has an ability to speak with the jury rather than to them.  He is very comfortable in the courtroom and conveys sincerity, a belief in his cases, and a confidence which jurors are drawn to.  He has been assigned several other "specials" due to his trial abilities.  They include several murders and sex offense cases.  Mr. Ipsen has an excellent knowledge and understanding of the law.  He reasons well and has demonstrated judgment and common sense.  His written work is organized, cogent and professional.

50.    Wynn further stated that "[o]utgoing, friendly and personable, Mr. Ipsen is popular with fellow employees.  He handles witnesses and victims with sensitivity and concern.  His personal appearance is professional and he makes a favorable impression inside and outside the courtroom."

51.    Two years later, Wynn's successor at the Van Nuys Branch wrote the following in Ipsen's 1998 PE.

> Based on [Ipsen's] outstanding trial skills, he has been selected to try some of the most difficult cases this branch has to offer. When particularly challenging cases arise, he is the first deputy this rater checks to see if he is available.

52.    After detailing Ipsen's success with "two extremely difficult cases," the supervisor further stated in Ipsen's 1998 PE that Ipsen's "adaptability and eagerness to

15

do whatever is necessary that needs to be done makes him a pleasure to supervise….Mr. Ipsen's inventive trial strategies and work ethic are well-known in the Van Nuys office.  He is professional in his dealings with opposing counsel while remaining a tenacious litigator.  In summary, he is seen as a formidable opponent for the best of defense attorneys."

53.    The above-cited comments came from Defendant John Spillane, who is now Chief Deputy District Attorney, the second highest official in the DA's Office.  After assuming his duties as Chief Deputy, Defendant Spillane actively enforced Defendants' Union Discrimination Policy.

54.    Ipsen's performance as a trial lawyer was so good that he was assigned to the Crimes Against Police Officers ("CAPOS") unit of the DA's Office in 1999.  As its title suggests, CAPOS focuses exclusively on crimes against law enforcement personnel, crimes that usually involve murders of officers.  CAPOS is considered one of the most prestigious units in the DA's Office.

55.    In Ipsen's 2002 PE, the supervisor at CAPOS described Ipsen's performance as follows:

> Mr. Ipsen is a highly effective advocate.  His advocacy is also tempered with ethics…Mr. Ipsen demonstrates initiative and good attitude.  Once he commences preparation for a case he dedicates a total and complete effort.  He works long hours to accomplish whatever is needed for the case.  Mr. Ipsen achieves outstanding results with his methods….One of his greatest attributes as a trial lawyer is his ability to creatively and effectively respond to

16

changing circumstances.  Mr. Ipsen is well liked by his fellow
prosecutors and support staff.  He enjoys an excellent reputation
with law enforcement.  Steven J. Ipsen is an outstanding deputy
district attorney who has been a valuable asset to the . . . Crimes
Against Peace Officers Section.

56.    The author of Ipsen's 2002 PE, Defendant John Zajec, is now a Director
in the DA's office, making him one of the highest-ranking officials in the Cooley
administration.  Defendant Zajec has participated directly in the enforcement of
Defendants' Union Discrimination Policy.

*Defendants' Acts of Retaliation Against ADDA President Ipsen for Union Activities*

57.    ADDA members elected Ipsen as their president in February 2002.  Later
that year, Ipsen made clear his goal of expanding ADDA's membership and using
ADDA as a vehicle to unionize deputy district attorneys.

58.    Defendants then engaged in a series of retaliatory actions against Ipsen
that dramatically intensified after ADDA became a certified union in 2008.

59.    After Ipsen assumed the presidency of ADDA in 2002, Defendants
removed Ipsen from CAPOS, stripped him of most of his trial duties and limited his
duties to filing criminal complaints.  Defendants transferred Ipsen to the Complaints
Division in retaliation for his union activism.

60.    Despite this punitive transfer, Ipsen continued meriting "Outstanding"
ratings from his supervisors while he was in the Complaints Division.

17

61.   In June 2003, Ipsen and ADDA filed a complaint with the California Commission on Judicial Performance alleging that some Los Angeles Superior Court judges illegally ordered the release of several defendants, including one defendant who committed a murder shortly after his release.  Defendant Steve Cooley strongly objected to the criticism Ipsen and other ADDA members leveled against these judges.

62.   Later in November 2003, Ipsen and other ADDA members published an advertisement in the *Los Angeles Daily Journal* calling for the defeat of the judges in the next election.

63.   Defendants retaliated against Ipsen by again transferring him, this time to the DA's Antelope Valley Branch in Lancaster, approximately 70 miles north of downtown Los Angeles.  As there were no open assignments in Lancaster at that time, Defendants facilitated Ipsen's punitive transfer by simultaneously transferring another Grade IV deputy out of Lancaster.  This deputy had been performing well in Lancaster, lived nearby, and did not want to be moved from his assignment.

64.   Despite this retaliation, Ipsen continued his outstanding performance.  Kerry White, Ipsen's supervisor in Lancaster, described a retrial in Ipsen's 2007 PE that Ipsen handled involving two co-defendants in a murder case.  Another prosecutor handled the first trial, resulting in a "not guilty" verdict for one of the defendants and a hung jury (nine jurors voting "not guilty") for the other defendant.

65.   White had "seriously considered dismissing the case" but Ipsen "put together a compelling memorandum demonstrating how there was sufficient evidence to prove the case beyond a reasonable doubt."  According to White, "DDA Ipsen

18

1    worked long hours putting the case together," and ultimately convinced a jury to

2    convict the remaining defendant.  White noted that "there are probably very few

3    attorneys in the office that could have won that retrial.  DDA Ipsen is clearly an

4    excellent trial attorney and has earned an outstanding rating for this evaluation

5    period."

6

7    66.    On March 24, 2008, Ipsen and his fellow ADDA members achieved their

8    long-sought goal of certification of ADDA by ERCOM as the employee organization

9    recognized to negotiate on behalf of deputy prosecutors.

10

11    67.    Around May 2008, a recently hired prosecutor assigned to Antelope

12    Valley requested advice from ADDA regarding intimidation by her supervisor, John

13    Nantroup.  Nantroup succeeded Kerry White as supervisor of Antelope Valley.  He

14    had unsuccessfully campaigned against Ipsen for ADDA's presidency in 2004 and,

15    unlike Ipsen, believed that ADDA should conform to the wishes of the Cooley

16    administration.

17

18    68.    Nantroup's intimidation of this newly hired prosecutor began when the

19    prosecutor learned that a deputy sheriff who was a witness in one of her cases had a

20    history of fabricating evidence against defendants.  The prosecutor notified the Brady

21    Unit[4] of the DA's Office, which advised her to disclose this information to the

22    defendant's attorney.

23    _____

24         [4] The "Brady Unit" derives its name from *Brady v. Maryland*, 373 U.S. 83 (1963), a case in
25    which the Supreme Court held that the U.S. Constitution's guarantee of due process compels
      prosecutors to disclose exculpatory evidence in their possession to defendants.  The Brady Unit
26    maintains records of allegations of misconduct by law enforcement officers that are subject to
27    *Brady's* disclosure requirements.  It also advises prosecutors throughout the County as to what
      evidence falls within this disclosure requirement.

28

                                         19

69.     Nantroup yelled at the prosecutor upon learning of her contact with the Brady Unit.  He then ordered her not to disclose the exculpatory evidence to the defendant and to never again contact the Brady Unit.

70.     Fearing (correctly) that a failure to comply with *Brady's* mandate can expose a prosecutor to sanctions from the State Bar, the new-hired prosecutor contacted ADDA Board Member Guy Shirley and requested assistance from the union.   Shirley began an investigation of the matter.  Ipsen also participated significantly in this investigation beginning in June 2008.

71.     Defendants ultimately assigned to case to another prosecutor.[5]

72.     Prior to the case being resolved, Defendants transferred Ipsen in July 2008, this time to the DA's office in Inglewood where his supervisor was Deputy District Attorney Shawn Randolph.  This transfer was another punitive act by Defendants and was made over Ipsen's strong objections.

73.     While Ipsen was assigned to Inglewood, Randolph prepared a PE for a younger, Grade II prosecutor who was also assigned to Inglewood and rated her "Not Competent."  This PE was inaccurate and omitted numerous positive aspects of this prosecutor's performance.  Randolph's evaluation resulted in the prosecutor's demotion from Grade II to Grade I.

---

[5]  The Los Angeles County DA's Office has a practice of retaliating against prosecutors who seek to comply with their constitutional duties under *Brady* when such compliance undermines the integrity of law enforcement witnesses.  See, *e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 414-415 (2006) (describing allegations of retaliation by the DA's office against deputy district attorney who questioned the veracity of a Los Angeles County Sheriff's deputy).

74.     In December 2008, Ipsen acted as a union steward for the demoted prosecutor and met with Randolph to explain why the prosecutor should be re-evaluated.  Additionally, ADDA retained counsel on behalf of the prosecutor.   As a result of the efforts by Ipsen, ADDA, and the attorney hired by ADDA, the prosecutor's evaluation was changed from "Not Competent" to "Competent" and the prosecutor being restored to Grade II status with recovery of all of her lost wages that had resulted from her unlawful demotion.

75.     On March 4, 2009, two armed DA Investigators hand delivered a letter to Ipsen notifying him that Defendants had suspended him for two days without pay for alleged misconduct during the meeting Ipsen had with Randolph in December 2008 in which Ipsen acted as union steward.

76.     The allegations Defendants made against Ipsen about his meeting with Randolph were false.  Defendants did not give Ipsen any opportunity to rebut the allegations.  Moreover, Ipsen acted in his capacity as a union steward during the December 2008 meeting.  Accordingly, Ipsen was not subject to employer discipline for his actions during this meeting.  Any objections Defendants had regarding Ipsen's actions as a union steward were required to be handled by filing complaints with ERCOM, not "handled" by armed DA Investigators and illegal suspensions.

77.     On May 28, 2009, Ipsen examined Robert Dver at an ERCOM administrative proceeding.  It was then that Dver testified publicly, for the first time, about the Union Discrimination Policy that Cooley had revealed to Dver when the two

1    met in October 2008.[6]  Ipsen followed up on July 9, 2009 with an examination of

2    Defendant Lacey, at which she admitted to the existence of Defendants' Policy.[7]

3

4    78.    Less than a week after Lacey's bombshell testimony, Defendants again

5    retaliated against Ipsen by presenting him with a "Needs Improvement" PE rating.

6    This rating was based on Randolph's false allegations relating to Ipsen's intervention

7    in December 2008 on behalf of the Grade II prosecutor that Randolph had falsely

8    maligned.  It was also based upon misleading statements by Nantroup, Ipsen's former

9    supervisor in Antelope Valley and the perpetrator of the *Brady* violation Ipsen and

10   ADDA had previously investigated.[8]

11

12   79.    The "Needs Improvement" PE subjects Ipsen to possible demotion or

13   termination at anytime until October 31, 2009.

14

15   80.    Defendants issued this PE two days before the beginning of ADDA's

16   campaign to achieve agency shop.[9]  Defendants timed the disclosure of Ipsen's false

17   PE to disrupt his ability to campaign for agency shop.

18

19   81.    Ipsen is currently assigned to the Compton Branch.  His supervisor in

20   Compton, Lance Wong, is a member of Defendant Cooley's management negotiating

21   team, the counterpart of ADDA's Contract Negotiating Team.  Since Ipsen's transfer

22

23   _____

24        [6] See *supra*, ¶¶ 24-30.

25        [7] See *supra*, ¶ 32.

26        [8] See *supra*, ¶ 69.

27        [9] An agency shop election is one in which members of a County bargaining unit vote to
28   determine whether union dues shall become mandatory for all members of the unit.

to Compton, Wong has been manufacturing grounds that could be used by Defendants to discipline, demote or terminate Ipsen.

*Defendants' Use of DA Investigators to Gag Media Coverage of ADDA*

82.     Defendants have used DA Investigators to intimidate and harass media outlets that have associated with ADDA and President Ipsen.

83.     One example is the Full Disclosure Network, a cable news program managed by Leslie Dutton, an Emmy-award winning producer.

84.     In late 2006 and early 2007, Dutton attempted to organize a law enforcement training conference at the Bonaventure Hotel in Los Angeles entitled "Gangs, Drugs and Immigration."

85.     In a letter dated March 14, 2007, Los Angeles County Sheriff Lee Baca stated to Dutton that he was "pleased to be a co-sponsor" and further stated that "[i]t is with great enthusiasm that I endorse this project and urge law enforcement personnel to support and attend the conference."

86.     ADDA President Steve Ipsen sent a letter to Dutton on May 23, 2007, stating that ADDA was proud to co-sponsor the conference with Sheriff Baca.

87.     Shortly thereafter, Dutton e-mailed an announcement regarding the conference to deputy prosecutors in the DA's Office.  This e-mail explained that the sponsors of the conference included ADDA.

88.     On July 5, 2007, two armed DA Investigators showed up unannounced at Dutton's office.  The Investigators repeatedly demanded that Dutton tell them who had given her the e-mail addresses for deputy district attorneys to whom Dutton had e-mailed the conference announcement.

89.     Dutton asked the Investigators why they insisted upon this information. The Investigators responded that the DA Office's computer system needed to be protected from viruses.

90.     When Dutton asked the Investigators if any of the e-mails she sent had contained viruses, they admitted that none had.

91.     Dutton asked if she had done anything illegal in sending the e-mails.  The DA Investigators admitted that nothing illegal had occurred, begging the question of why two armed investigators arrived unannounced at Dutton's office in the first place.

92.     Two weeks after DA Investigators interrogated Dutton, the Los Angeles Sheriff's Department withdrew its support for the conference.  Dutton was forced to cancel it.

93.     Plaintiffs are informed, believe, and thereon allege that Defendants pressured the Sheriff's Department to withdraw its support from Dutton's conference due to ADDA's participation in it.[10]

---

[10] This is not the first time Defendants have used DA Investigators to bully small media outlets. In May 2002, after obtaining an illegal search warrant, Defendants ordered DA Investigators to raid the Los Angeles offices of the *Metropolitan News*.  Their behavior prompted a *Los Angeles Times* editorial comparing the DA Investigators who conducted the raid to "thugs" and "vandals."  See The D.A.'s Press Attack, *Los Angeles Times*, May 4, 2002.

24

*ADDA Vice President Marc Debbaudt's Background:*

94.     DDA Marc Debbaudt is Vice President of ADDA and has been since 2002.   He currently sits on ADDA's Labor Committee, Litigation Committee, ERCOM committee, and Contract Negotiating Team.

95.     In Debbaudt's 2009 PE, his supervisor described Debbaudt as "the best calendar deputy I have ever seen in the office."

96.     Debbaudt's prior supervisors have heaped similar praises on him.  In January 2005, Debbaudt's supervisor in the San Fernando Branch, Beverly Campbell, made these comments in Debbaudt's PE that year:

> Marc is an excellent calendar deputy and is highly regarded by his
> peers and subordinates as well as the defense bar and bench.  He has
> won the trust and admiration of his judge as well as the public
> defenders assigned to his court.  Marc is an excellent mentor and
> counselor. He has done an outstanding job in maintaining a
> professional atmosphere in his court. The public defenders feel
> confident that perceived grievances are handled appropriately. Mr.
> Debbaudt has outstanding interpersonal skills and is extremely
> approachable. As a result, he routinely solves problems before they
> become of crisis proportion. He performs well in new situations and
> does so with a minimum of instructions. However, he seeks
> guidance when appropriate and communicates potential problems to
> his supervisors. Judge Taylor is effusive in praising him not only for
> his calendar management but also for his ability to get along with

everyone in the courthouse.  Mr. Debbaudt's legal knowledge, legal reasoning, judgment, and oral and written presentations are excellent. Marc is a team player who willingly tries cases as well as runs a calendar. His calendar management is excellent. He always knows his cases and is well prepared on both the facts and the law.

Mr. Debbaudt is sensitive to the needs of victims and witnesses. He is well liked and has a delightful sense of humor. He can always be depended upon to handle sensitive situations in an appropriate manner.  He is a credit to the office and a pleasure to supervise.

97.    Campbell's successor at the San Fernando Branch, Michael Grosbard, wrote an equally glowing PE in December 2006 regarding Debbaudt's work:

[Debbaudt] possesses a unique combination of intelligence, experience, and common sense that result in excellent judgment. His legal knowledge is extensive and his ability to engage in legal reasoning is unparalleled. Mr. Debbaudt's calendar is always organized and well prepared.  He provides guidance to the deputies assigned to his court and assigns work in a fair and evenhanded manner. He is cognizant of and adheres to office policy.

Mr. Debbaudt willingly assists in the operation of the office in any way he can. He has a terrific attitude, providing legal advice or personal assistance to anyone who is in need. Mr. Debbaudt supervises the law clerks and legal interns, teaching them how to

26

conduct preliminary hearings, motion writing and otherwise making sure that they have a positive experience here. He is well liked and respected by everyone in this office and by bench officers and defense attorneys as well.

He has the highest ethical standards and conveys the importance of ethical behavior to those he works with and supervises. He is a credit to the legal profession. Mr. Debbaudt fully deserves an outstanding rating.

*Defendants' Acts of Retaliation Against Debbaudt for his Union Activities*

98.     Debbaudt has been an active member of ADDA for most of this decade and has been a vocal supporter of unionizing deputy prosecutors.

99.     In 2004, he was endorsed by ADDA as a candidate who ran unsuccessfully against Los Angeles Superior Court Judge Daniel Oki due to allegations that Judge Oki and other judges had unlawfully released numerous violent offenders.[11]

100.   In October 2005 DA Investigators began harassing Debbaudt while ostensibly investigating a complaint that Michael Kraut, an openly gay deputy district attorney in San Fernando, was creating a "hostile work environment."

101.   Four DA Investigators and another prosecutor interrogated Debbaudt at the San Fernando Police Station regarding the complaint against Kraut.

---

[11] See, *supra*, ¶¶ 61-62.

27

102.   Debbaudt's interrogators repeatedly asked him how he knew Kraut was gay.

103.   DA Investigators asked these questions despite knowing that Kraut was openly gay and that his sexual orientation was common knowledge throughout the San Fernando office.

104.   DA Investigators kept asking Debbaudt how *Debbaudt* knew that Kraut was gay.  From the tone and manner of their questioning, it was clear that DA Investigators were questioning Debbaudt's own sexuality.  Debbaudt, who is heterosexual, finally stated that he had not had sex with Kraut and therefore could not testify from first-hand experience that Kraut was, in fact, gay.

105.   In July 2007, Debbaudt wrote a letter on ADDA letterhead on behalf of ADDA to unions throughout Los Angeles County asking them to withhold support from Cooley's 2008 campaign for re-election due to Cooley's anti-union actions.

106.   Subsequently, Defendant Lacey attended one of ADDA's board meetings and said that the DA's office was investigating the allegations contained in the letter. She did not explain what authority Defendant Cooley had to use County resources to discredit the political criticisms of Cooley that were contained in the letter.

107.   During several ADDA meetings in the summer of 2008, Debbaudt criticized Defendants' unlawful alteration of the procedures used in preparing PEs for deputy district attorneys.  He played a key role in drafting an unfair labor practices complaint with ERCOM challenging the legality of these new PE procedures.

108.   In September 2008 Defendants subjected Debbaudt to a punitive transfer as a result of his role in drafting this complaint as well as for other acts taken in his capacity as an ADDA member.

109.   Defendants first decided in September 2008 to transfer Debbaudt to an entry-level position in the East Lake Juvenile Court.

110.   Juvenile court assignments are almost always filled by inexperienced deputies, not those such as Debbaudt with twenty-plus years of experience and "Outstanding" ratings from supervisors.

111.   Days later, Defendants decided to transfer Debbaudt to an entry-level assignment in Pomona Juvenile Court, an assignment located 42 miles from Debbaudt's home.

112.   Defendant Lacey, through her attorney, later admitted that "Mr. Debbaudt was not transferred as part of the usual, normal every couple of months transfer."  She also admitted that, though office policy is to transfer deputies based upon the needs of the office, there was no legitimate need in Pomona Juvenile for Debbaudt.  She further admitted that Defendant Cooley himself ordered Debbaudt's transfer, that such orders were infrequent, and that Debbaudt was the only Grade IV deputy district attorney transferred to an entry-level juvenile assignment in the last five years.

113.   Debbaudt reported for work in Pomona Juvenile on October 16, 2008. His last day of work there was December 5, 2008, at which time he was scheduled to begin work at Sylmar Juvenile Court on December 8, 2008.  On December 6, 2008

severely fractured his right tibia and was on medical leave until February 23, 2009, at which time his doctor released him to commence work at Sylmar Juvenile Court.

114.   Debbaudt's supervisor at Pomona Juvenile Court was Abram Weisbrot.

115.   In January 2009, Weisbrot issued a PE that rated Debbaudt substantially lower than any of the prior PEs he had received in his 24-year career with the office. For each of the prior 23 years, Debbaudt received "Outstanding" PEs.  Weisbrot's evaluation reduced Debbaudt's rating by two tiers, to "Meets Expectations." Defendants provided no explanation for this two-tier downgrade.

116.   Weisbrot issued this PE after Debbaudt had worked for barely two months in Pomona, despite the fact that (1) Grade IV deputies are almost never issued a PE until they've been in at an assignment for over one year and (2) Debbaudt's supervisor, for whom Debbaudt had served for eight months of the 2008 rating period, described Debbaudt as "the best calendar deputy I have ever seen in the office."

117.   After Debbaudt spent two months in Pomona Juvenile Court, Defendants transferred him to the Sylmar Juvenile Court in January 2009.

118.    Defendants made this transfer despite the fact that Grade IV deputies such as Debbaudt are normally permitted to stay in a particular assignment for at least four years.  Debbaudt currently remains at his Sylmar Juvenile assignment.

1    *Hyatt Seligman's Background*

2

3        119.   Another active ADDA member who has been subject to Defendants'

4    discriminatory policies is Hyatt Seligman, a 30-year veteran of the DA's office and, at

5    all times pertinent to this action, a member of ADDA.

6

7        120.   For much of the first half of his career in the DA's Office, Seligman tried

8    murder cases involving defendants claiming mental disease as a defense.

9

10       121.   Seligman is arguably the most knowledgeable prosecutor in the state on

11   the subject of mental defenses in criminal cases.  He authored the practice guide on

12   mental defenses used by the California District Attorneys Association and distributed

13   to prosecutors throughout the state.

14

15       122.   From 1996 to 2006, Seligman was assigned to the Training Division of

16   the DA's Office.  During that time, he personally trained hundreds of new deputy

17   prosecutors for the office.  Seligman received "Outstanding" ratings during the entire

18   time he was assigned to the Training Division.

19

20       123.   In May 2006, Seligman was assigned to the position of Deputy-In-

21   Charge of the Psychiatric Section of the DA's Office, a unit of the office specializing

22   in issues involving competency of defendants to stand trial and extensions of

23   involuntary commitments in state hospitals for mentally disordered offenders found

24   not guilty of crimes by reason of insanity.

25

26       124.   As the Deputy-In-Charge of the Psychiatric Section, Seligman supervised

27   other deputies assigned to the unit.  Seligman performed numerous tasks that had not

28

31

1   been performed by his predecessor.  He consulted, almost on a daily basis, with both

2   of the Superior Court judges assigned to hear psychiatric cases as well as all of his

3   deputies, most of the defense attorneys who specialized in psychiatric cases, and the

4   psychiatrists who routinely testified as expert witnesses.

5

6         125.   Seligman routinely visited mental hospitals run by the California

7   Department of Mental Health.  He also visited separately-run juvenile mental health

8   centers and volunteered to speak with sexual offenders and their families.  He even

9   donated some of his used suits to a job-interview program established for them.

10

11        126.   He participated in a panel discussion held at Patton Hospital that was

12  televised live to all five state hospitals and all the mental health psychiatrists and

13  technicians and social workers.  Seligman consulted with the Hospital's directors and

14  their administrative and treating psychiatrists and provided lectures for their benefit.

15

16        127.   Seligman lectured to psychiatric fellows at USC and cross-examined

17  psychiatric fellows from UCLA in mock training exercises. He also met with officials

18  from the National Association of Mental Illness in order to develop programs that

19  accommodated both the needs of the mentally ill accused of violent felonies while

20  also protecting society from them.

21

22         128.   The DA's Office tasked Seligman with responsibility for reviewing

23  legislative proposals affecting the mentally ill and the criminal justice system.  He

24  provided key input that Governor Arnold Schwarzenegger relied upon in vetoing a

25  poorly drafted bill concerning the establishment of criminal courts devoted to the

26  mentally ill.  Seligman also played a key role in drafting a bill to allow prosecutors to

27  select an expert to examine a defendant who puts his or her mental state at issue in a

28

32

criminal case.  Governor Schwarzenegger signed this bill, AB 1516, on October 11, 2009.

129.    While at the Psychiatric Section, Seligman volunteered to lecture to deputy prosecutors at the DA's offices throughout the County on how to process and litigate competency and conservatorship issues and the interplay between these issues and issues arising in criminal cases.  He continued training all newly-hired deputies on trial advocacy and other key legal issues and doctrines.  He also regularly lectured to various law enforcement agencies throughout the County on issues such as Confession Law and Search and Seizure.

130.   During the time he was assigned to Psychiatric Section, Seligman received "Outstanding" ratings from his superiors.

*Seligman's 2008 Punitive Transfer*

131.   Seligman testified before the Los Angeles County Employee Relations Commission in 2007 in hearings to determine whether ADDA should be certified as an employee organization qualified to represent deputy district attorneys in negotiations for a collective bargaining agreement with the County.

132.   Seligman offered key testimony that convinced the Commission to certify ADDA an employee organization.  ADDA trumpeted Seligman's role in convincing ERCOM on March 24, 2008 to recognize ADDA as a County employee organization.

33

133.   Approximately one month after ERCOM certified ADDA, Richard Doyle, a high level official in the Cooley Administration, called Seligman and told him he was being transferred out of the Psychiatric Section.  Doyle said he did not know the reason for Seligman's transfer, despite the fact that Directors normally conduct all transfers in the DA's Office.  Doyle told Seligman that he had done such a good job that Seligman could choose his next assignment.

134.   Seligman called Doyle early the following week and asked for an assignment in which he would continue to have supervisory authority, either as a Deputy-In-Charge or as Assistant Head Deputy.  Doyle said no such openings existed.

135.   Seligman then requested an assignment in the Major Crimes Division.  Doyle said there was no opening there.

136.   Seligman then requested an assignment in the Organized Crimes Division.  Doyle told him there was no opening there.

137.   Finally, Seligman requested to be sent back to the Training Division.  Doyle granted this request, but refused to give Seligman a supervisory position, despite the fact that Seligman's supervisors had rated him "Outstanding" in his previous, supervisory assignment in the Psychiatric Section.

*Seligman's 2009 Punitive Transfer*

138.   In 2009 Seligman joined ADDA's Contract Negotiating Team.

34

139.   In a bargaining session on March 17, 2009, Seligman questioned Defendants' punitive transfers of prosecutors.  In response, a member of Cooley's bargaining team told Seligman that she found his comments to be "off-putting." Seligman told her that he apologized if she found his comments to be offensive.

140.   Two days later, Seligman's supervisor in the Training Division informed him that Defendants were transferring Seligman to the DA's branch office in Long Beach.  Seligman's supervisor was upset by the transfer and did not want to lose Seligman as a trainer for new deputy prosecutors, given that he had performed key components of every training class for the past thirteen years.  In fact, Seligman was informed that he was not to have any role whatsoever in training any of the new prosecutors.

141.   Defendants' punitive transfers of Seligman and Dver[12] from the Training Division have ensured that no active ADDA members are available to train newly hired prosecutors and that new prosecutors, in turn, will not have any pro-union mentors during the early years of their careers in the DA's office.

142.   Seligman promptly contacted Michael Tranbarger, the Head Deputy of the Long Beach Branch Office and the person who would soon be Seligman's superior.  Tranbarger informed Seligman that Long Beach did not need Seligman and did not have any office space for him.  He then said that he would find somewhere to put a desk for Seligman, even if it was in a hallway.

---

[12] See, *supra*, ¶ 30.

1       143.   Seligman's assignments in Long Beach do not include any training of

2   deputy prosecutors or special expertise in psychiatric issues.

3

4       144.   Defendants subjected Seligman to these punitive transfers in accordance

5   with their Union Discrimination Policy.

6

7       145.    Four months after Defendants transferred him to Long Beach, Seligman

8   received a PE rating of "Meets Expectations" from Tranbarger.  This rating was two

9   tiers below the "Outstanding" ratings Seligman had previously received throughout

10  his career.  The PE did not describe any of Seligman's work during his prior eight

11  months at the Training Division, despite the fact that PEs are supposed to be based

12  upon a prosecutor's performance for an entire 12-month period.

13

14      146.   When Seligman asked Tranbarger about the PE, Tranbarger explained that

15  a "Meets Expectations" rating was the highest rating he was allowed to give to

16  Seligman and, if he had given Seligman a higher rating in his PE, Defendants would

17  have "kicked it back" to Tranbarger and made him revise it.

18

19

20  *DDA James Bozajian's Background*

21

22      147.   James Bozajian is a Grade III deputy district attorney.  He joined the

23  DA's office in 1990 and has been on ADDA's Board of Directors since 1993.  He

24  served as ADDA's President in 1996 and 1997.

25

26      148.   Bozajian has also served as a member of the Calabasas City Council for

27  13 years.

28

36

149.   As with his fellow ADDA colleagues, Bozajian has routinely received "Outstanding" ratings on his PEs.  His 2007 PE contained the following remarks:

> Mr. Bozajian did an excellent job in the arraignment court in San
> Fernando.  He took the job very seriously and represented our office
> well in court.  He overhauled the filing system for [drug court] and
> bench warrant files so that the files are more readily accessible.  He
> read files carefully in preparation for arraignments, making sure that the
> charges filed and the bail requested were appropriate.  Mr. Bozajian
> would bring to my attention issues that he spotted which may have
> eluded the filing deputies.  Mr. Bozajian also displayed initiative in
> taking upon himself the preparation on a monthly basis of statistics on
> [drug court] and [deferred entry of judgment] cases.
> Mr. Bozajian has been very dependable in his attendance and
> observance of work hours.  Despite the fact that the arraignment court
> was not an easy assignment as it often ran late into the evening, Mr.
> Bozajian approached the assignment without any complaints.  He
> required minimal instruction, yet sought guidance when appropriate.
>
> Mr. Bozajian got along well with his colleagues, office staff and
> courtroom staff.  Mr. Bozajian did an outstanding job in San Fernando.

150.   As a result of Bozajian's participation and support of ADDA, Defendants have transferred him eight times in the past eight years.

37

151.   These transfers included three years in the Juvenile Courts in Sylmar and Antelope Valley between 2001 and 2004, an unprecedented punishment for a prosecutor with over a decade of experience, as Bozajian had at that time.

152.   After Bozajian and other ADDA Board members began seeking certification of ADDA as an employee organization, Defendants used DA Investigators to harass him.

153.   In January 2006, Defendants instructed two DA Investigators to hand deliver a letter to Bozajian.  This letter threatened disciplinary action if he sent political material from his home computer to other deputy district attorneys.

154.   When the DA Investigators served this letter upon Bozajian, they were apologetic and expressed their regrets to him.

155.   This harassment came in the midst of one of the most hotly contested elections in ADDA's history.  Defendants had tacitly supported a rival slate of candidates who opposed unionization.  Defendants used DA Investigators to disrupt the re-election efforts of ADDA Board Members such as Bozajian.

156.   Steve Ipsen, ADDA's President, was also personally served with a letter by DA Investigators threatening discipline against him.

157.   Both before and after January 2006, Defendants routinely permitted non-ADDA members to use office e-mail addresses to send and receive political material. They have also permitted ADDA members deemed to be pro-Cooley to use office e-mail addresses for the same purpose.

1     158.   On or about May 26, 2008, Bozajian mailed a letter to all of his fellow

2   deputies in the DA's Office.  The letter was entitled "10 Reasons Why Steve Cooley

3   Does Not Deserve Another Term in Office."  Bozajian sent the letter to each deputy's

4   office via U.S. Mail and bore all of the related mailing and copying expenses.

5

6     159.   Defendants Cooley and Spillane illegally ordered the impoundment and

7   destruction of this mail.

8

9     160.   On October 19, 2009, Defendants suspended Bozajian without pay for 30

10   days.  Plaintiffs are informed, believe, and thereon allege that Bozajian's suspension

11   resulted from Defendants' anti-union animus.

12

13

14                   **FIRST CAUSE OF ACTION**

15    **(Violation of U.S. Constitution, Amendment I – Freedom of Association)**

16           **(On Behalf of All Plaintiffs Against All Defendants)**

17

18     161.   Plaintiffs hereby incorporate by reference all of the foregoing allegations

19   as if set forth fully herein.

20

21     162.   ADDA desires to have its members be able to gather together and

22   promote the activities of ADDA including, but not limited to, organizing deputy

23   district attorneys, representing deputy district attorneys in negotiations with the

24   County regarding collective bargaining agreements, and advancing legislative

25   proposals in the California Legislature and the County Board of Supervisors that are

26   beneficial to ADDA members and the criminal justice system.

27

28

163.   Defendants' Union Discrimination Policy has hindered ADDA and its members from organizing and recruiting other deputy district attorneys to become members of ADDA and promote the activities of ADDA.

164.   Defendants' Union Discrimination Policy has also violated the rights of the Unnamed DDA and other deputy district attorneys who desire to become active members of ADDA but do not want to risk exposure to Defendants' Union Discrimination Policy.

165.   Accordingly, Defendants' Union Discrimination Policy violates the right of free association guaranteed by the First Amendment to the United States Constitution, made applicable to state and local governments through the Due Process Clause of the Fourteenth Amendment.

## SECOND CAUSE OF ACTION
### (Violation of U.S. Constitution, Amendment I – Freedom of Speech)
### (On Behalf of All Plaintiffs Against All Defendants)

166.    Plaintiffs hereby incorporate by reference all of the foregoing allegations as if set forth fully herein.

167.   ADDA and its members have a constitutional right to free speech in relation to the promotion of the activities of ADDA including, but not limited to, organizing deputy district attorneys, representing deputy district attorneys in negotiations with the County regarding collective bargaining agreements, and

1   advancing legislative proposals in the California Legislature and the County Board of

2   Supervisors that are beneficial to ADDA members and the criminal justice system.

3

4        168.   Defendants' Union Discrimination Policy has hindered ADDA and its

5   members from speaking out about these matters.

6

7        169.   Defendants' Union Discrimination Policy has also violated the free

8   speech rights of the Unnamed DDA and other district attorneys who desire to become

9   active members of ADDA and speak out about matters concerning ADDA but do not

10  want to risk exposure to Defendants' Union Discrimination Policy.

11

12       170.   Accordingly, Defendants' Union Discrimination Policy violates the right

13  of free speech guaranteed by the First Amendment to the United States Constitution,

14  made applicable to state and local governments through the Due Process Clause of the

15  Fourteenth Amendment.

16

17                    **THIRD CAUSE OF ACTION**

18      **(Violation of U.S. Constitution, Amendment XIV – Equal Protection)**

19          **(On Behalf of All Plaintiffs Against All Defendants)**

20

21       171.    Plaintiffs hereby incorporate by reference all of the foregoing

22  allegations as if set forth fully herein.

23

24       172.    The Equal Protection Clause of the Fourteenth Amendment requires

25  the government to treat similarly-situated persons equally.

26

27

28

173.     Defendants' enforcement of their Union Discrimination Policy discriminates against ADDA members while allowing similarly-situated County employees to enjoy their constitutional rights without interference.

174.     By the treating ADDA members in a discriminatory manner, Defendants have violated Plaintiffs' fundamental constitutional rights.

175.     Defendants have no rational justification for their discrimination against ADDA and its members.

176.     Therefore, Defendants' Union Discrimination Policy violates the Equal Protection Clause of the Fourteenth Amendment.

**WHEREFORE**, Plaintiffs pray for judgment against the Defendants and that the Court:

A.   Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter and claims in controversy in order that such declarations shall have the force and effect of a final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's Orders;

B.   Pursuant to 28 U.S.C. §2201, declare that the Defendants' policies and practices, as alleged above, violate the First and Fourteenth Amendments to the United States Constitution;

42

C.   Pursuant to 28 U.S.C. §2202, F.R.C.P. Rule 65, and 42 U.S.C. § 1983, preliminarily and permanently enjoin the Defendants from enforcing their unconstitutional policies and practices against Plaintiffs and others similarly situated;

D.   Pursuant to 42 U.S.C. §1988, and other applicable law, award the Plaintiffs their costs and expenses incurred in bringing this action, including its reasonable attorneys' fees;

E.   Award Plaintiff ADDA compensatory and punitive damages for the injuries suffered in violation of federal law in an amount to be determined by a jury; and

F.   Grant such other and further relief as the Court deems equitable and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs request a jury trial for all issues so triable.

DATED:  October 28, 2009

Respectfully submitted,

_____

Matthew G. Monforton, Esq.
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Facsimile: (406) 586-3869
e-mail: matthewmonforton@yahoo.com

Attorney for Plaintiffs

43

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge George H. Wu and the assigned discovery Magistrate Judge is Suzanne H. Segal.

The case number on all documents filed with the Court should read as follows:

## CV09- 7931 GW (SSx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)       NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:

Matthew G. Monforton, Esq.
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
(406) 570-2949

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| One Unnamed Deputy District Attorney; Association of Deputy District Attorneys, | CASE NUMBER |
|---|---|
| **PLAINTIFF(S)** | CV09-7931 ODW (SSx) |
| v. | |
| County of Los Angeles; Steve Cooley; _See Attachment_ | **SUMMONS** |
| **DEFENDANT(S).** | |

TO:   DEFENDANT(S): _____   _____

A lawsuit has been filed against you.

Within  __20__  days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Matthew G. Monforton_, whose address is _32 Kelly Court, Bozeman, Montana 59718_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   __30 OCT 2009__                    By: _____
                                                      **SHEA BOURGEOIS**
                                                      Deputy Clerk
                                                      **SEAL**
                                                      (Seal of the Court)

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)]._

Name & Address:

Matthew G. Monforton, Esq.
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
(406) 570-2949

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| One Unnamed Deputy District Attorney; Association of Deputy District Attorneys, | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | |
| v. | |
| County of Los Angeles; Steve Cooley, *See Attachment* | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): _____   _____

_____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Matthew G. Monforton_____, whose address is _32 Kelly Court, Bozeman, Montana 59718_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:

Matthew G. Monforton, Esq.
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
(406) 570-2949

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| One Unnamed Deputy District Attorney; Association of Deputy District Attorneys,<br><br>PLAINTIFF(S)<br><br>v.<br><br>County of Los Angeles; Steve Cooley;<br>~~See~~ Attachment<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV09-7931** ⊕w (SSx)<br><br><br>**SUMMONS** |

TO:     DEFENDANT(S): '_____   _____   _____

_____

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Matthew G. Monforton_____, whose address is _32 Kelly Court, Bozeman, Montana 59718_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____3 0 OCT 2009_____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| One Unnamed Deputy District Attorney; Association of Deputy District Attorneys | County of Los Angeles; Steve Cooley; Curtis Hazell; John Spillane; John Zaj◌; Jacqueline Lacey |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Matthew G. Monforton<br>Monforton Law Offices, PLLC<br>32 Kelly Court<br>Bozeman, Montana 59718   (406) 570-2949 | Unknown |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF |
|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to D◌ Judge from Magistrate◌

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No    **MONEY DEMANDED IN COMPLAINT: $** To Be Determined At Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. s. 1983; Case arises from unlawful infringement of Plaintiffs' First Amendment Rights by County officials

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending |  | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations |  | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
|  | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 490 Cable/Sat TV |  | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations |  | ☐ 861 HIA (1395ff) |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (9◌) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise |  | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 440 Other Civil Rights |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions |  | ☐ 871 IRS-Third Party USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability |  |  |  |
|  | ☐ 290 All Other Real Property |  |  |  |

CV09-7931

**FOR OFFICE USE ONLY:**   Case Number: _____

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): Eng v. County of Los Angeles, Steve Cooley, et al, CV 05-2686 ODW (SSx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑A. Arise from the same or closely related transactions, happenings, or events; or
   ☑B. Call for determination of the same or substantially related or similar questions of law and fact; or
   ☑C. For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date Oct 26, 2009

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |