1   Matthew G. Monforton, Esq.  (SBN 175518)
2   Monforton Law Offices, PLLC
    32 Kelly Court
3   Bozeman, Montana 59718
4   Telephone:   (406) 570-2949
    Facsimile:   (406) 586-3869
5   E-mail:      matthewmonforton@yahoo.com
6
7   Attorney for One Unnamed Deputy District
    Attorney and Association of Deputy District
8   Attorneys
9
10
11
12  Gregory W. Smith   (SBN 134385)
    Marla A. Brown   (SBN 140158)
13  LAW OFFICES OF GREGORY W. SMITH
    6300 Canoga Avenue, Suite 1590
14  Woodland Hills, California  91367
15  Telephone :  (818) 712-4000
    Facsimile:  (818) 712-4004
16  E-mail:  mbrown@gwslegal.com
17
18
    Christopher Brizzolara, Esq.  (SBN 130304)
19  1528 16th Street
20  Santa Monica, California  90404
    Telephone:  (310) 394-6447
21  Facsimile:  (310) 656-7701
22
23  Attorneys for Plaintiffs Steven J. Ipsen,
    Marc Debbaudt, Hyatt Seligman
24
25
26
27
28

1

**FIRST AMENDED COMPLAINT**

FILED
CLERK, U.S. DISTRICT COURT

MAY 12 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

1

2

3

4

5

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| 6  ONE UNNAMED DEPUTY DISTRICT ATTORNEY; ASSOCIATION OF DEPUTY DISTRICT ATTORNEYS, a Los Angeles County Employee Organization, STEVEN J. IPSEN, an individual, MARC DEBBAUDT, an individual, and HYATT SELIGMAN, an individual, | ) Case No. CV 09-7931 ODW (SSx) |

6

7

8

9

10

11

ONE UNNAMED DEPUTY DISTRICT ATTORNEY; ASSOCIATION OF DEPUTY DISTRICT ATTORNEYS, a Los Angeles County Employee Organization, STEVEN J. IPSEN, an individual, MARC DEBBAUDT, an individual, and HYATT SELIGMAN, an individual,

Plaintiffs,

v.

COUNTY OF LOS ANGELES; STEVE COOLEY, individually and in his official capacity; CURTIS HAZELL, individually and in his official capacity, JOHN SPILLANE, individually and in his official capacity; JOHN ZAJEC, individually and in his official capacity; JACQUELYN LACEY, individually and in her official capacity, PETER A. BURKE, individually and in his official capacity; JANET MOORE, individually and in her official capacity; MARIO TRUJILLO, individually and in his official capacity; LANCE WONG individually and in his official capacity and DOES 1 - 10and DOES 1 - 10

Defendants.

)  Case No. CV 09-7931 ODW (SSx)

)  **CLASS ACTION**

)  ~~[PROPOSED]~~
**FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND DECLARATORY RELIEF**

)  **DEMAND FOR JURY TRIAL**

2

**FIRST AMENDED COMPLAINT**

# PRELIMINARY STATEMENT

1.    This case arises from an anti-union policy implemented by Defendant Steven Cooley, the District Attorney of Los Angeles County, and his senior officials. They have called the president of the employees' union representing deputy district attorneys, plaintiff STEVEN J. IPSEN (hereinafter "Ipsen") a "crook." Worse, they have declared that prosecutors who join the union, a group including the Plaintiffs named herein, are "ratifying dishonesty" and are "contaminated," thereby justifying "disastrous" career consequences for any such deputy.

2.    Remarkably, Defendants admitted in sworn testimony that they retaliate against prosecutors who join the union. As described in detail below, the victims of Defendants' discriminatory policy are some of the best and brightest prosecutors in the District Attorney's Office. Defendants' discriminatory acts include transferring senior union members to juvenile courts, assignments reserved for young, inexperienced prosecutors. For more experienced prosecutors, such transfers amount to a career death sentence. These assignments often involve substantial commutes from prosecutors' residences and are referred to by Defendants as "freeway therapy." Defendants are also retaliating against union-represented prosecutors by threatening to reduce their health care benefits beginning in January 2010.

3.    Defendants use District Attorney Investigators (*i.e.*, law enforcement officers working directly for Defendants) to harass and intimidate the union's most active members as well as their allies in the media, a practice harkening back to the kind of 19th Century thuggery commonly employed against union organizers. On at least one occasion, DA Investigators have attempted to manufacture evidence that a heterosexual union board member engaged in homosexual conduct, a tactic they have employed against targets in other cases.

3

**FIRST AMENDED COMPLAINT**

1     4.    Each of these acts constitutes an adverse employment action substantially

2    motivated by protected association and/or speech, including speech touching on public

3    policy as set forth herein.

4

5     5.    Defendants' retaliation against Ipsen, the union's president has been

6    especially severe, involving numerous punitive transfers, an illegal suspension without

7    pay and inclusion of false allegations in his most recent performance evaluation.[1]

8

9     6.    Plaintiffs seek to exercise their First Amendment rights of freedom of

10   speech and freedom of association to engage in union-related activities without being

11   subjected to Defendants' policy of discrimination and intimidation.

12

13    7.    Plaintiff Association of Deputy District Attorneys also brings this suit as

14   a Class Action pursuant to F.R.Civ.P. Rules 23(a), (b)(2) and (b)(3) on behalf of the

15   Los Angeles County Deputy District Attorneys in Grades I through IV during the

16   period from December 2007 to February 2008 who signed union cards demonstrating

17   their desire to become unionized employees.  Plaintiffs' class-based claims arise from

18   the unlawful disclosure to Cooley and his management officials of a list identifying

19   each of these prosecutors, and his subsequent use of that list to intimidate, harass and

20   slander union supporters.  This disclosure illegally revealed one of the most personal

21   and sensitive decisions employees ever make in their careers.  As explained by the

22   head of the County's independent labor agency, this disclosure may subject any union

23   _____

24       [1] Punitive transfers, law enforcement harassment (including attempts to manufacture

25   evidence of homosexual conduct by heterosexual men), illegal suspensions, and false employee
allegations are also par for the course for other deputies who exercise their First Amendment rights

26   in ways Defendants find displeasing. See, *e.g.*, First Amended Complaint, ¶¶ 33, 59, 67-71, filed in

27   *Eng v. County of Los Angeles, Steve Cooley, et al.* (C.D. Cal. Case No. CV 05-2686).  As detailed
below, Defendants sharply increased their reliance upon these practices after Plaintiff Association of

28   Deputy District Attorneys became a certified public employees union in March 2008.

**FIRST AMENDED COMPLAINT**

1  supporter to "retaliation by management, which may include discipline up to and

2  including termination under a pretense."[2]  Plaintiffs therefore seek damages on behalf

3  of all prosecutors who are victims of what amounts to identity theft committed against

4  them by Cooley and his agents.

5

6  ## JURISDICTION AND VENUE

7      8.      This Court has subject matter jurisdiction over this case under 28

8  U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the

9  United States Constitution; under 28 U.S.C. § 1343(a)(3), in that Plaintiffs seek

10 redress for deprivations made under color of state law of rights, privileges, and

11 immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4),

12 in that Plaintiffs seek damages and equitable relief under 42 U.S.C. § 1983, which

13 provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b)

14 for an award of attorneys fees; under 28 U.S.C. § 2201(a) to secure declaratory relief;

15 and under 28 U.S.C. § 2202 to secure preliminary and permanent injunctive relief.

16

17     9.      Venue is proper in the United States District Court for the Central

18 District of California under 28 U.S.C. § 1391(b), because the events giving rise to the

19 claims described in this Complaint occurred within Los Angeles County.

20

## PARTIES

21     10.     Plaintiff Association of Deputy District Attorneys ("ADDA") is an

22 employee organization (*i.e.*, public employees union) formed in accordance with Los

23 Angeles County's Employee Relations Ordinance.  The Los Angeles County

24 Employee Relations Commission, the County agency that oversees employee relations

25 between the County and its public employees unions, certified ADDA as the official

26 _____

27     [2] The class action allegations required under Cent. Dist. Local Rule. 23-2.2 are contained on

28 pages 56 through 59 of this Complaint.

**FIRST AMENDED COMPLAINT**

1   representative for Los Angeles County Employees Bargaining Unit 801 in March

2   2008. ADDA has approximately 300 deputy district attorneys as members and

3   Bargaining Unit 801 consists of deputy district attorneys in Grades I through IV.

4   There are approximately over 700 additional deputy district attorneys who are eligible

5   to become members of the ADDA.

6

7          11.     The Unnamed Deputy District Attorney Plaintiff is currently a deputy

8   district attorney in the DA's Office and shall be referred to as the "Unnamed DDA." [3]

9   The Unnamed DDA is eligible for ADDA membership but is not yet a member.

10  He/she intends to join ADDA as a dues-paying member and become active in the

11  organization's affairs once there is an injunction preventing Defendants from

12  discriminating against ADDA members. The Unnamed DDA resides in Los Angeles

13  County.

14

15         12.     Plaintiff Steven J. Ipsen ("Ipsen") is currently a Grade IV deputy

16  district attorney in the DA's Office and the President of ADDA, who resides in Los

17  Angeles County, who has been active in ADDA's affairs and in its organization prior

18  to its certification as a bargaining unit.

19

20         13.     Plaintiff Marc Debbaudt ("Debbaudt") is currently a Grade IV deputy

21  district attorney in the DA's office and the Vice-President of ADDA, who resides in

22  Los Angeles County, who has been active in ADDA's affairs and in its organization

23  prior to its certification as a bargaining unit.

24

25  _____

26        [3] The Unnamed DDA is suing anonymously in accordance with *Does I thru XXIII v.*

27  *Advanced Textile Corp.,* 214 F.3d 1058, 1069-1071 (9th Cir. 2000). He/she will file a motion for
    leave to proceed by using a pseudonym in the event that Defendants object to his/her continued

28  presence in this action as an anonymous party.

**FIRST AMENDED COMPLAINT**

1       14.    Plaintiff Hyatt Seligman ("Seligman") is currently a Grade IV deputy

2   district attorney in the DA's office who resides in Orange County and a member of

3   ADDA who is active in ADDA's affairs and who was instrumental in obtaining

4   ADDA's certification as a bargaining unit, and who in 2009 became a member of

5   ADDA's contract negotiating team.

6

7       15.    Defendant Los Angeles County is a municipal corporation and at all

8   times mentioned herein has been the employer of the Unnamed DDA as well as

9   plaintiffs Ipsen, Debbaudt and Seligman. The remaining individual defendants, sued

10   here in both their personal and official capacities, were at all relevant times mentioned

11   herein employees and/or agents of Los Angeles County.

12

13       16.    Defendant Steve Cooley is, and at all times herein mentioned was, the

14   District Attorney for the County of Los Angeles. He was first elected to office in

15   November 2000. His office has approximately 1,000 deputy prosecutors. Defendant

16   Cooley resides in the County of Los Angeles. He is sued in his personal and official

17   capacity.

18

19       17.    Defendants Curtis Hazell, John Spillane, John Zajec, and Jacquelyn

20   Lacey have been at all times pertinent to this action top ranking officials in the

21   administration of Defendant Cooley. Each of these Defendants has authority over

22   promotions, demotions, transfers and discipline within the DA's Office and each has

23   illegally discriminated and retaliated against plaintiffs Ipsen, Debbaudt, Seligman and

24   other union members in matters pertaining to promotions, transfers, and discipline.

25   This policy is described in detail below. They are sued in their personal and official

26   capacities.

27

28

7

**FIRST AMENDED COMPLAINT**

18.      Defendant Peter A. Burke has been at all times pertinent to this action an Assistant Head Deputy District Attorney in District Attorney's Office. He is sued in his personal and official capacity.

19.      Defendants Janet Moore, Lance Wong and Mario Trujillo have been at all times pertinent to this action members of Defendant Cooley's management team. Each of these Defendants conspired with Cooley, Burke, and other persons to violate the constitutional rights of deputy district attorneys by revealing whether they signed a union card requesting representation by ADDA, and threatening adverse employment actions against those that supported unionization as well as by slandering them. They are sued in their personal and official capacities.

20.      Plaintiffs are informed, believe and thereon allege that at all relevant times herein, each of the fictitiously named defendants was an agent, employee or co-conspirator of one or more of the named defendants, and was acting within the course and scope of said agency or employment. Plaintiffs are further informed, believe and thereon allege that each of the fictitiously-named defendants aided and assisted the named Defendants in committing the wrongful acts alleged herein, and that Plaintiffs' damages, as alleged herein, were proximately caused by such Defendants.

21.      Plaintiffs are informed, believe and thereon allege that Defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing such acts, acting pursuant to and in furtherance of said conspiracy, and each Defendant sued herein is jointly and severally responsible and liable to Plaintiffs for the damages alleged herein.

22.      Defendants, and each of them, and/or their agents/employees knew or

**FIRST AMENDED COMPLAINT**

1   should have known that each of the remaining co-Defendants, individually and

2   together in varying combinations, was engaging in the conduct alleged herein.

3

4

5                                **FACTS**

6

7                                  **1.**

8        **Admissions by Defendants Regarding Their Policy of**

9        **Discriminating Against ADDA, Plaintiffs Ipsen, Debbaudt,**

10       **Seligman, and other ADDA Members**

11

12       23.    On March 24, 2008, Los Angeles County's Employee Relations

13   Commission ("ERCOM") certified ADDA as the employee organization recognized

14   to represent the prosecutors of County Bargaining Unit 801.  Prior to organizing,

15   ADDA was an entity that served primarily as a vehicle for social events for deputy

16   prosecutors.  After certification, ADDA became a full-fledged public employees union

17   with the same rights and responsibilities as any other County-recognized union.

18

19       24.    Shortly before ADDA's certification, ADDA Vice President Frank

20   Tavelman sent an email to Defendant Lacey, ADDA's liaison with the

21   Administration, requesting the DA's office state, in writing, that it would comply with

22   State and Federal law and remain neutral regarding union issues and that it would

23   refrain from taking punitive action against any prosecutor for exercising his or her

24   right to join ADDA.

25

26       25.    Defendant Lacey told Tavelman that Defendants would not comply with

27   ADDA's request.  Rather than honor ADDA's request to take a neutral position,

28

                                    9

                     **FIRST AMENDED COMPLAINT**

1  Defendants implemented an office-wide policy of discriminating against ADDA

2  members regarding promotions, demotions, and transfers.  This policy, and the actions

3  of the individual Defendants taken in furtherance of this policy, shall hereinafter be

4  referred to as Defendants' "Union Discrimination Policy."

5

6      26.    Shortly before October 17, 2008, Defendant Lacey met with Robert

7  Dver, a 24-year veteran prosecutor and, at that time, the Assistant Head Deputy of the

8  Training Division of the DA's Office.  The Training Division is responsible for

9  providing, *inter alia*, a one-month training seminar for all newly hired prosecutors,

10  followed by additional seminars during the first two years of new prosecutors' careers.

11  During their early years in the office, newly-hired prosecutors often look to their

12  trainers as mentors and routinely seek advice from them not only relating to cases but

13  also to office policies, both written and unwritten.

14

15      27.    Dver and Defendant Lacey were close friends prior to October 17, 2008.

16

17      28.    When they met, Dver told Defendant Lacey that he wanted to join

18  ADDA's Contract Negotiating Team, which was scheduled to begin negotiating with

19  Cooley's management team later in the year.  ADDA believed Dver would be a

20  significant asset to its team, as both ADDA's leadership and Defendants regarded

21  Dver as highly ethical and one of the best prosecutors in the DA's Office.

22

23      29.    Dver told Defendant Lacey that he wanted to join ADDA's Contract

24  Negotiating Team because he believed he could help achieve reasonable compromises

25  between ADDA and the Cooley Administration.  Dver intended to tell Defendant

26  Cooley of his decision and sought advice from Defendant Lacey as to how best to

27  approach him.  Dver was also friends with Defendant Cooley at that time - Cooley had

28

**FIRST AMENDED COMPLAINT**

1    previously attended bar mitzvahs for Dver's children - and thought he should speak to

2    Cooley face-to-face about his decision.

3

4        30.    Defendant Lacey told Dver not to join ADDA's negotiating team and

5    also told him not to even bring up the subject with Defendant Cooley.  To do so, she

6    said, would be a "disaster" for Dver's career.

7

8        31.    Dver nevertheless met with Defendant Cooley on October 17, 2008 in

9    order to discuss his desire to join ADDA's bargaining team.

10

11       32.    Defendant Cooley reacted to Dver's idea with disgust.  He told Dver that

12   many of ADDA's members supported unionization as a result of Dver doing so and

13   that ADDA had exploited Dver's reputation to aid its organizational activities.

14

15       33.    Defendant Cooley then slandered ADDA's President, Steve Ipsen, by

16   referring to him as a "crook" and declared that the prosecutors who signed the union

17   cards leading to ADDA's certification were "contaminated."

18

19       34.    Defendant Cooley had obtained a confidential list of ADDA members

20   who signed union cards when one of his subordinates, Peter Burke, unlawfully

21   obtained the list from ERCOM.  Immediately upon obtaining the list, Burke published

22   it to unauthorized persons and attached it as an exhibit to a state court complaint he

23   filed the day before Dver met with Defendant Cooley.

24

25       35.    Defendant Cooley instructed Dver to "undermine" ADDA since,

26   according to Cooley, Dver signed a union card and encouraged other DDA's to join,

27   and was therefore responsible for ADDA's certification as a public employees union.

28

11

**FIRST AMENDED COMPLAINT**

1  Defendant Cooley further instructed Dver to team up with Burke and another deputy
2  prosecutor, Tom Rubinson, in their efforts to undermine ADDA.[4]

3

4      36.    Dver was shocked by Defendant Cooley's anti-union animus and did not
5  agree to his demand to "undermine" ADDA and concluded that his career was over.

6

7      37.    After the meeting on October 17, 2008, Defendant Cooley transferred
8  Dver out of the Training Division. Defendant Cooley also demoted Dver from his
9  position as Assistant Head Deputy and stripped him of his supervisory tasks.

10

11      38.    Dver never joined ADDA's bargaining team. Plaintiffs are informed,
12  believe, and thereon allege that Defendants' intimidation and harassment of Dver
13  caused him to decline ADDA's offer to join its bargaining team.

14

15      39.    On July 9, 2009, Defendant Lacey testified under oath at a hearing and
16  admitted that participation in ADDA, particularly its negotiating team, is detrimental
17  to a deputy prosecutor's career.

18

19      40.    In response to questions posed by ADDA President Ipsen, who was
20  representing himself at that hearing, Defendant Lacey elaborated upon Defendants'
21  Union Discrimination Policy and her reasons for dissuading Dver from joining
22  ADDA's bargaining team:

23

24      Q    …. Did you think it would be bad for [Dver's] career if he

25

26  _____

27  [4] The day before the meeting between Dver and Defendant Cooley, Burke filed a lawsuit in
   state court alleging irregularities in a recent ADDA election. This suit is now on appeal. Tom
28  Rubinson now sits on the Los Angeles County Superior Court.

**FIRST AMENDED COMPLAINT**

1    was closely allied with the Union, meaning it would lessen his

2    chance of getting promoted to Grade Five by Steve Cooley?

3

4    A.   No. In as much as if you were the President, --

5

6    Q.   Okay.

7

8    A.   -- Yeah,  I did.

9

10   Q.   And you believed that it would hurt his chances and hurt his

11        career if he did that while I was President?

12

13   A.   I definitely thought being associated with you would hurt him.

14

15   Q.   Or even with the Union while I was President?

16

17   A.   While you were President.

18

19   Q.   Would hurt him in the sense of hurt his career?

20

21   A.   Yes.

22

23   Q.   Why did you think that?

24

25   A.   I thought that because Mr. Cooley felt that you were

26        dishonest and felt quite frankly that anybody associated

27        with you would be ratifying or endorsing that dishonesty.

28

13

**FIRST AMENDED COMPLAINT**

41.     Later in that same proceeding, Defendant Lacey admitted that "I felt that it would be bad for [Dver] to be associated with the union with [Ipsen] at the leadership."

42.     Defendants' Union Discrimination Policy is commonly known among deputy district attorneys throughout Los Angeles County.

**2**

**Cooley Officials' Unlawful Acquisition and Exploitation of**

**The Highly Confidential List of Prosecutors who Returned**

**Union Cards**

43.     Sometime in early October 2008, ERCOM unlawfully gave to Defendant Peter Burke a highly confidential list (hereinafter, the "List") submitted to it earlier in the year by ADDA identifying those prosecutors that had returned union cards and in doing so demonstrated their desire to become unionized employees.

44.     Burke attached the List as an exhibit to a complaint he filed in Superior Court on October 16, 2008.

45.     The dangers created by this shocking breach of confidentiality were described by ERCOM's Executive Director Paul Causey in a declaration he filed a week later in Superior Court seeking to seal the List:

> Disclosing the fact that a person signed a union authorization card could subject the person to retaliation by management, which may include discipline up to and including termination under a pretense.

14

**FIRST AMENDED COMPLAINT**

46.     Every prosecutor who returned a union card had a right to privacy as to that fact under both ERCOM rules as well as clearly established federal law.  Prior to submission by ADDA of the List to ERCOM, Mr. Causey expressly promised ADDA Board Members that the List would never be disclosed to members of the Cooley Administration.

47.     During a subsequent examination before ERCOM in 2009, Burke admitted that he distributed copies of the List to at least six other persons.  He refused to identify these individuals and admitted that he had given each of these persons a written promise that he would never reveal their identities.

48.     ADDA successfully sought an order from the Superior Court in December 2009 requiring Burke to identify the six persons to whom he gave copies of the List.

49.     At a subsequent hearing before ERCOM in January 2010, Burke admitted that four of the persons to whom he gave copies of the List included these Cooley Administration officials: Bureau Director Janet Moore, Head Deputy District Attorney Lance Wong, who is a member of Cooley's collective bargaining team and the person assigned the task of harassing Plaintiff Ipsen in late 2009, and Mario Trujillo, a special assistant to Bureau Directors Pam Booth and John Zajec.

50.     Burke admitted giving these persons copies of the List on October 16, 2008, the same day that he filed his complaint in Superior Court.

51.     The day after Burke filed his suit and gave copies of the List to top

15

**FIRST AMENDED COMPLAINT**

1   Cooley officials, Cooley had the meeting with Rob Dver described earlier in this

2   Complaint. At that meeting, Cooley said that he knew Dver had signed a union card

3   and that ADDA had used that fact to sign up hundreds of young deputies who looked

4   up to Dver. Absent the shocking invasion of prosecutors' privacy rights resulting

5   from the disclosure of the List by Burke and other Cooley administration officials,

6   Cooley could not have known about Dver signing a card.

7

8      52.   Defendants have asserted that prosecutors who signed union cards --

9   prosecutors whose identities are now known to Defendants -- are "contaminated" and

10  that they have "ratified dishonesty" by associating with ADDA.

11

12      53.   Plaintiffs are informed, believe and therefore allege that Defendant

13  Cooley has expressly threatened adverse employment actions against those

14  prosecutors who have signed union cards, associated with Ipsen or joined ADDA's

15  bargaining team.

16

17                          **3**

18    **Injuries Being Sustained by Plaintiffs as a Result of Defendants'**

19    **Union Discrimination Policy**

20

21      54.   Defendants' Union Discrimination Policy has deprived, and is continuing

22  to deprive, Plaintiffs and ADDA's members of their constitutional rights to freedom

23  of association and freedom of speech in numerous ways.

24

25      55.   For example, Defendants gave written notice to all deputy prosecutors

26  that, beginning in January 2010, the County will reduce the health care benefits of all

27  union-represented prosecutors in the DA's Office.

28

16

**FIRST AMENDED COMPLAINT**

1

2   56.    Besides violating both federal and state law, Defendants' threats to

3   reduce health care benefits starting in January 2010 have hindered ADDA's ability to

4   recruit and retain members.

5

6   57.    As detailed in the remainder of this Complaint, Defendants have also

7   subjected Plaintiffs Ipsen, Debbaudt, Seligman and other ADDA members to punitive

8   transfers, illegal suspensions, and intimidation by armed DA Investigators. They have

9   called ADDA's president Ipsen a "crook" and declared that all other members of

10  ADDA have "ratif[ied] dishonesty" by joining the union and associating with Ipsen.

11  These smears would damage the reputation of any attorney. They are extraordinarily

12  damaging to prosecutors, attorneys from whom the judicial system rightly demands

13  the highest ethics. More than simply insulting, the slandering of 300 ADDA

14  prosecutors by the men and women who run the DA's office has created a moral

15  stigma that, left undisturbed, will cause reasonable, non-member prosecutors to think

16  twice before joining ADDA.

17

18  58.    Each of these acts constitutes an adverse employment action substantially

19  motivated by protected association and/or speech, including speech touching on

20  matters relating to public policy as set forth herein.

21

22  59.    In taking these actions, Defendants seek to chill Plaintiffs' constitutional

23  rights to freedom of association and freedom of speech by discouraging non-ADDA

24  prosecutors, including the Unnamed DDA, from joining the union. These actions are

25  unlawfully undermining  plaintiff ADDA's representation of prosecutors in the DA's

26  office and financially damaging plaintiff ADDA by depriving it of dues-paying

27  members who would join the union but for Defendants' illegal actions.

28

17

**FIRST AMENDED COMPLAINT**

60. Defendants also seek to chill Plaintiffs' constitutional rights to freedom of association and freedom of speech by punishing Plaintiffs and other ADDA members, such as Dver, who desire to aid ADDA's Contract Negotiating Team.

61. Defendants also have sought and continue to seek to chill Ipsen's constitutional rights to freedom of association and freedom of speech by punishing him through repeated punitive and retaliatory transfers amounting to "freeway therapy" to chill Ipsen's right to participate in ADDA bargaining sessions and other activities, and from speaking out on public policy issues critical of DA Cooley's administration, and DA Cooley, including running against him in the 2008 election, subjecting Ipsen to lowered performance evaluations, placement on an unfounded and retaliatory "Plan for Individual Improvement," and assignment to duties befitting deputy DA's of far lesser experience, which discrimination and retaliation continue.

62. Defendants also sought and continue to seek to chill Debbaudt's constitutional rights to freedom of association and freedom of speech by punishing him through repeated punitive and retaliatory transfers amounting to "freeway therapy" to chill Debbaudt's right to participate in ADDA bargaining sessions and other activities, and from speaking out on public policy issues critical of DA Cooley's administration, and DA Cooley, including supporting opposing candidates in the 2004 and 2008 elections, subjecting Debbaudt to lowered performance evaluations, and assignment to duties befitting deputy DA's of far lesser experience, which discrimination and retaliation continue.

63. Defendants also sought and continue to seek to chill Seligman's constitutional rights to freedom of association and freedom of speech by punishing

18

**FIRST AMENDED COMPLAINT**

1   him through repeated punitive and retaliatory transfers and assignments.   Seligman is

2   also member of ADDA's Contract Negotiating Team.   During a bargaining session in

3   2009 Seligman questioned Defendants' denials that punitive transfers occur in the

4   DA's office.   Defendants became so irate at having a deputy prosecutor dare to ask

5   such a question that, two days later, Seligman found *himself* on the receiving end of

6   one of those transfers.

7

8        64.    Defendants' illegal retaliation and threats of continued retaliation against

9   highly respected prosecutors such as Ipsen, Debbaudt, Dver and Seligman have

10   deprived ADDA of valuable and persuasive persons to represent it in collective

11   bargaining negotiations.   Additionally, Defendants' retaliation against members of

12   ADDA's Contract Negotiating Team including Ipsen, Debbaudt and Seligman,

13   plaintiffs herein, in response to statements made in bargaining sessions has been

14   intended to chill the team's ability to represent ADDA and its members.   The removal

15   of Dver and Seligman from the Training Division has further injured ADDA by

16   depriving newly-hired prosecutors of pro-union mentors, thereby reducing the chances

17   that newly-hired prosecutors will make the mistake of "contaminating" themselves --

18   in the words of Steve Cooley -- by joining ADDA.

19

20        65.    Defendants' illegal retaliation and threats of continued retaliation against

21   highly respected prosecutors such as Ipsen, Debbaudt, Dver and Seligman have

22   deprived ADDA of valuable and persuasive persons capable of speaking on public

23   policy matters and including "issues about which information is needed or appropriate

24   to enable the members of society to make informed decisions about the operation of

25   their government."

26

27

28

**FIRST AMENDED COMPLAINT**

**4.**

**Application of the Union Discrimination Policy to Individual ADDA Members**

66.     Defendants have applied their Union Discrimination Policy against ADAA members, particularly members of ADDA's Board of Directors, including Plaintiffs Ipsen, Debbaudt, and Seligman, who have actively sought to organize deputy district attorneys into a viable collective bargaining organization.  Examples of how Defendants apply their Policy are detailed below.

*ADDA President Steve Ipsen's Background:*

67.     DDA Steve Ipsen joined the Los Angeles County District Attorney's Office 1987.  He has been ADDA's President since February 2002 and also served on the Board of Directors for the State Bar of California from 2002 to 2005.  He is currently a Grade IV deputy.

68.     Until July 15, 2009, Ipsen's supervisors had predominately rated him "Outstanding," the highest rating a deputy district attorney can receive on his or her performance evaluation ("PE").

69.     One of Ipsen's "Outstanding" PE's came in 1993 from his supervisor at the San Fernando Branch of the DA's Office.  This supervisor observed the following about Ipsen:

Mr. Ipsen continues to accept the most difficult and complicated cases. He has achieved exceptional results in their prosecution.  He is willing

20

**FIRST AMENDED COMPLAINT**

1      to spend the time necessary to adequately prepare assigned cases. He

2      is diligent and hard working and thoroughly dedicated. He is well

3      liked by his peers and witnesses have confidence in his ability. He has

4      an enviable record of trial success. His legal reasoning and judgment

5      are sound. His greatest strength lies in the fact that jurors like him.

6      Mr. Ipsen remains an asset to this office and his skills will only

7      improve with additional experience.

8

9 The supervisor expressing these comments was Defendant Steve Cooley who, in

10 1993, was the Head Deputy of the San Fernando Branch.

11

12      70.    Ipsen's prior supervisor in San Fernando, Billy Webb, congratulated

13 Ipsen in Ipsen's 1991 PE for developing what Webb described as a "unique video

14 process for presenting documentary evidence that generated accolades from judges,

15 attorneys and expert witnesses alike." Webb concluded his 1991 PE by noting that

16 "[w]e have several top flight trial attorneys here in San Fernando. [Ipsen] is one of

17 the top two or three."

18

19      71.    After 1993, Ipsen moved to the Van Nuys Branch. Philip Wynn, Ipsen's

20 supervisor in Van Nuys, stated the following in Ipsen's 1996 PE:

21

22      Mr. Ipsen is an outstanding trial attorney. He has an ability to speak with

23      the jury rather than to them. He is very comfortable in the courtroom and

24      conveys sincerity, a belief in his cases, and a confidence which jurors are

25      drawn to. He has been assigned several other "specials" due to his trial

26      abilities. They include several murders and sex offense cases. Mr. Ipsen

27      has an excellent knowledge and understanding of the law. He reasons well

28

**FIRST AMENDED COMPLAINT**

1  and has demonstrated judgment and common sense. His written work is

2  organized, cogent and professional.

3

4   72. Wynn further stated that "[o]utgoing, friendly and personable, Mr. Ipsen

5 is popular with fellow employees. He handles witnesses and victims with sensitivity

6 and concern. His personal appearance is professional and he makes a favorable

7 impression inside and outside the courtroom."

8

9   73. Two years later, Wynn's successor at the Van Nuys Branch wrote the

10 following in Ipsen's 1998 PE.

11

12   Based on [Ipsen's] outstanding trial skills, he has been selected to

13   try some of the most difficult cases this branch has to offer. When

14   particularly challenging cases arise, he is the first deputy this rater

15   checks to see if he is available.

16

17   74. After detailing Ipsen's success with "two extremely difficult cases," the

18 supervisor further stated in Ipsen's 1998 PE that Ipsen's "adaptability and eagerness to

19 do whatever is necessary that needs to be done makes him a pleasure to

20 supervise....Mr. Ipsen's inventive trial strategies and work ethic are well-known in the

21 Van Nuys office. He is professional in his dealings with opposing counsel while

22 remaining a tenacious litigator. In summary, he is seen as a formidable opponent for

23 the best of defense attorneys."

24

25   75. The above-cited comments came from Defendant John Spillane, who is

26 now Chief Deputy District Attorney, the second highest official in the DA's Office.

27

28

22

<strong>FIRST AMENDED COMPLAINT</strong>

1  After assuming his duties as Chief Deputy, Defendant Spillane actively enforced

2  Defendants' Union Discrimination Policy.

3

4      76.    Ipsen's performance as a trial lawyer was so good that he was assigned to

5  the Crimes Against Police Officers ("CAPOS") unit of the DA's Office in 1999.  As

6  its title suggests, CAPOS focuses exclusively on crimes against law enforcement

7  personnel, crimes that usually involve murders of officers.  CAPOS is considered one

8  of the most prestigious units in the DA's Office.

9

10     77.    In Ipsen's 2002 PE, the supervisor at CAPOS described Ipsen's

11  performance as follows:

12

13          Mr. Ipsen is a highly effective advocate.  His advocacy is also

14          tempered with ethics…Mr. Ipsen demonstrates initiative and good

15          attitude.  Once he commences preparation for a case he dedicates a

16          total and complete effort.  He works long hours to accomplish

17          whatever is needed for the case.  Mr. Ipsen achieves outstanding

18          results with his methods….One of his greatest attributes as a trial

19          lawyer is his ability to creatively and effectively respond to

20          changing circumstances.  Mr. Ipsen is well liked by his fellow

21          prosecutors and support staff.  He enjoys an excellent reputation

22          with law enforcement.  Steven J. Ipsen is an outstanding deputy

23          district attorney who has been a valuable asset to the . . . Crimes

24          Against Peace Officers Section.

25

26     78.    The author of Ipsen's 2002 PE, Defendant John Zajec, is now a Director

27  in the DA's office, making him one of the highest-ranking officials in the Cooley

28

23

**FIRST AMENDED COMPLAINT**

1   administration. Defendant Zajec has participated directly in the enforcement of

2   Defendants' Union Discrimination Policy.

3

4   *Defendants' Acts of Retaliation Against ADDA President Ipsen in Violation of His*

5   *First Amendment Rights of Free Speech and Freedom of Association*

6

7       79.   ADDA members elected Ipsen as their president in February 2002. Later

8   that year, Ipsen made clear his goal of expanding ADDA's membership and using

9   ADDA as a vehicle to unionize deputy district attorneys.

10

11       80.   Defendants then engaged in a series of retaliatory actions against Ipsen

12   that dramatically intensified after ADDA became a certified union in 2008.

13

14       81.   After Ipsen assumed the presidency of ADDA in 2002, Defendants

15   removed Ipsen from CAPOS, stripped him of most of his trial duties and limited his

16   duties to filing criminal complaints. Defendants transferred Ipsen to the Complaints

17   Division in retaliation for his union activism.

18

19       82.   Despite this punitive transfer, Ipsen continued meriting "Outstanding"

20   ratings from his supervisors while he was in the Complaints Division.

21

22       83.   In June 2003, Ipsen and ADDA filed a complaint with the California

23   Commission on Judicial Performance alleging that some Los Angeles Superior Court

24   judges illegally ordered the release of several defendants, including one defendant

25   who committed a murder shortly after his release. Defendant Steve Cooley strongly

26   objected to the position Ipsen and the ADDA Board had taken, including opposing the

27

28

24

**FIRST AMENDED COMPLAINT**

1    re-election of the judges who had ordered the release, and taking out ad space in the

2    *Los Angeles Daily Journal* stating ADDA's position.

3

4        84.    Later in November 2003, Ipsen published an advertisement in the *Los*

5    *Angeles Daily Journal* calling for the defeat of the judges in the next election.

6    Defendant Cooley endorsed each of these judges and attended fundraisers to assist in

7    their re-election.

8

9        85.    During the efforts of the ADDA and Ipsen to support ADDA candidates

10    in this judicial race, Defendants retaliated against Ipsen, and sought to interfere with

11    his free speech rights and efforts to organize the union, by transferring him to the most

12    remote branch office, the Antelope Valley Branch in Lancaster, approximately 70

13    miles north of downtown Los Angeles.  As there were no open assignments in

14    Lancaster at that time, Defendants facilitated Ipsen's punitive transfer by

15    simultaneously transferring another Grade IV deputy out of Lancaster.  This deputy

16    had been performing well in Lancaster, and did not want to be moved from his

17    assignment.

18

19        86.    Despite this retaliation, Ipsen continued his ADDA efforts and

20    outstanding performance. Kerry White, Ipsen's supervisor in Lancaster, described a

21    retrial in Ipsen's 2007 PE that Ipsen handled involving two co-defendants in a murder

22    case.  Another prosecutor handled the first trial, resulting in a "not guilty" verdict for

23    one of the defendants and a hung jury (nine jurors voting "not guilty") for the other

24    defendant.

25

26        87.    White had "seriously considered dismissing the case" but Ipsen "put

27    together a compelling memorandum demonstrating how there was sufficient evidence

28

25

**FIRST AMENDED COMPLAINT**

1   to prove the case beyond a reasonable doubt." According to White, "DDA Ipsen

2   worked long hours putting the case together," and ultimately convinced a jury to

3   convict the remaining defendant. White noted that "there are probably very few

4   attorneys in the office that could have won that retrial. DDA Ipsen is clearly an

5   excellent trial attorney and has earned an outstanding rating for this evaluation

6   period."

7

8       88.   In the fall of 2004, Ipsen became aware of a ballot initiative known as

9   Proposition 66 that threatened to dilute the three strikes law and release an estimated

10   26,000 dangerous felons. Lead by Ipsen, ADDA actively campaigned against Prop.

11   66, while DA Cooley did not. Just weeks prior to the November, 2004 election Prop.

12   66 was winning by an approximate 20% margin, and Ipsen personally wrote and

13   distributed materials entitled "The Insider" describing the deceptive claims of Prop.

14   66, and rallied supporters, ADDA and DDA's across the state to distribute these

15   materials. Ipsen also met with a homicide victim's brother, now wealthy victim's

16   rights leader, in order to secure financing for a broadcast media campaign to defeat

17   Prop. 66, and co-wrote a radio commercial days before the election featuring Govs.

18   Schwarzenegger, Brown, Ipsen and the victims rights leader who had lost his sister to

19   murder.

20

21       89.   Proposition 66 was defeated in the 2004 election, and following this

22   defeat, DA Cooley attended his last ADDA meeting. During a discussion about

23   ADDA's participation in the campaign, in front of the ADDA Board Cooley stated:

24   "Ipsen you are such a whore."

25

26

27

28

**FIRST AMENDED COMPLAINT**

90.     During the fall of 2006, Ipsen and the entire ADDA board won re-election by a vote of 344 to 40. The opposing slate featured a group composed substantially of supervisory DDA's.  They were again re-elected in 2007.

91.     During the spring and fall of 2006, Ipsen campaigned in support of Jessica's Law, an initiative initially opposed by Defendant Cooley as an outspoken critic.

92.     In the years leading up to the 2008 election a consensus developed  on the ADDA Board that the office and county would be better served with a district attorney that had a greater concern for public safety, and the proper treatment of the attorneys employed by the office who dedicated their lives to prosecuting crime.  As ADDA President, Ipsen began in 2006 and 2007 to seek viable candidates who might reflect these values and run for district attorney, or a slate of individuals who might seek to force the DA into a runoff. Several persons were contacted, and none indicated an intent or willingness to run for the office, but encouraged Ipsen to do so. Some of the persons included members of the Superior Court, DA Management, ADDA Board, and ADDA membership.  When the efforts did not result in a candidate, it was determined that Ipsen would run.  Though a majority of ADDA Board members signed personal endorsement statements for Ipsen, he did to seek the ADDA endorsement or do extensive fundraising within the office out of concern for retaliation by Cooley supporters.  During the course of this campaign, Ipsen spoke out on issues and expressed viewpoints which were contrary to those of Defendant Steve Cooley, and exposed misconduct and failures of the DAs office in several areas, including:

a)     Jessica's Law:  Efforts by Cooley, with cooperation of other members of the court system, to ignore the provisions of Jessica's law, and undermine the voters'

27

**FIRST AMENDED COMPLAINT**

1  intent, which Ipsen brought to the attention of the media including the L.A. Times,

2  resulting in a court decision mandating a longer commitment term for the most

3  sexually violent predators – contrary to the position advocated by Cooley;

4       b)    Jamiel Shaw/Immigration Issue:    Ipsen campaigned aggressively

5  that the Murder of Jamiel Shaw Jr. was the direct result of not only special order 40,

6  but more broadly by a conspiracy between the DAs office and the criminal courts

7  system to ignore the citizenship status of illegal aliens, particularly illegal alien gang

8  members. Ipsen appeared with the Shaw family at a Los Angeles County Board of

9  Supervisors meeting and spoke during the comment portion on this failure of DA

10  policy. Ipsen spoke at a Shaw family event during his campaign at  which Assistant

11  DA Curt Hazell was present as Ipsen criticized the DA and office for the policy that

12  allowed probation for illegal alien gang members, early release of illegal alien gang

13  members and ordered DDAs to ignore citizen status of illegal alien gang members

14  status when determining issues of bail and whether probation should be granted.

15

16      93.    In Ipsen's Performance Evaluation documenting his alleged drop from

17  "Outstanding" when last rated to "Needs Improvement" in 2009, the supervisor cited

18  Ipsen's inclusion of the defendant's status as an "Illegal Alien" in file documents as a

19  violation of office policy. This drop in rating, based in part on Ipsen's documentation

20  of a defendant's status as an illegal alien, subjected Ipsen to the threat of demotion or

21  termination under civil service rules.

22

23      94.    On March 24, 2008, Ipsen and his fellow ADDA members achieved their

24  long-sought goal of certification of ADDA by ERCOM as the employee organization

25  recognized to negotiate on behalf of deputy prosecutors.

26

27      95.    Around May 2008, a Grade III prosecutor assigned to Antelope Valley

28

**FIRST AMENDED COMPLAINT**

1   requested advice from ADDA regarding intimidation by her supervisor, John

2   Nantroup.   Nantroup succeeded Kerry White  as supervisor of Antelope Valley.  He

3   had unsuccessfully campaigned against Ipsen for ADDA's presidency in 2004, and

4   has remained adversarial.

5

6

7   96.     Nantroup's intimidation of this prosecutor began when the prosecutor

8   learned that a deputy sheriff who was a witness in one of her cases had a history of

9   fabricating evidence against defendants.  The prosecutor notified the Brady Unit[5] of

10   the DA's Office, which advised her to disclose this information to the defendant's

11   attorney.

12

13   97.     Nantroup yelled at the prosecutor upon learning of her contact with the

14   Brady Unit.  He then ordered her not to disclose the exculpatory evidence to the

15   defendant and to never again contact the Brady Unit.

16

17   98.     Fearing (correctly) that a failure to comply with *Brady's* mandate can

18   expose a prosecutor to sanctions from the State Bar, the newly-hired prosecutor

19   contacted ADDA Board Member Guy Shirley and requested advice.  Shirley began an

20   investigation of the matter.  Ipsen also participated significantly in this investigation

21   beginning in June 2008.  The prosecutor remains afraid of consequences.

22

23   _____

24       [5] The "Brady Unit" derives its name from *Brady v. Maryland*, 373 U.S. 83 (1963), a case in

25   which the Supreme Court held that the U.S. Constitution's guarantee of due process compels
     prosecutors to disclose exculpatory evidence in their possession to defendants.  The Brady Unit

26   maintains records of allegations of misconduct by law enforcement officers that are subject to

27   *Brady's* disclosure requirements.  It also advises prosecutors throughout the County as to what
     evidence falls within this disclosure requirement.

28

**FIRST AMENDED COMPLAINT**

99. The District Attorney election was held in June, 2008, at which time Defendant Cooley was re-elected, defeating Ipsen. Following this result, Defendants intensified their retaliatory efforts against Ipsen, notwithstanding that ADDA's bargaining process was underway, in what constituted a clear, unabridged effort to punish and retaliate against Ipsen for his activities in support of ADDA and for his commentary during the election campaign.

100. After the election, and the ongoing ADDA investigation, Defendants ultimately assigned the *Brady* issue case to another prosecutor, an act which appears retaliatory to the original prosecutor who contacted the *Brady* unit.[6]

101. Prior to that case being resolved, and after the election, in July, 2008 Defendants transferred Ipsen, to the DA's office in Inglewood where his supervisor was Deputy District Attorney Shawn Randolph. This transfer was another punitive act by Defendants and was made over Ipsen's strong objections. In fact, on June 20, 2008, Ipsen had submitted an assignment preference request and requested a transfer to the Criminal Courts Building (CCB) "Compatible with his ADDA duties and Collective Bargaining duties" and his residence which was located in West Los Angeles."

102. On July 21, 2008, Ipsen submitted an informal email/grievance in response to the Inglewood transfer, on the grounds that it hindered his ADDA bargaining duties and that it was an assignment out of his grade.

---

[6] The Los Angeles County DA's Office has a practice of retaliating against prosecutors who seek to comply with their constitutional duties under *Brady* when such compliance undermines the integrity of law enforcement witnesses. See, *e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 414-415 (2006) (describing allegations of retaliation by the DA's office against deputy district attorney who questioned the veracity of a Los Angeles County Sheriff's deputy).

30

**FIRST AMENDED COMPLAINT**

103.   While Ipsen was assigned to Inglewood, Randolph prepared a PE for a younger, Grade II prosecutor who was also assigned to Inglewood and rated her "Not Competent." This PE was inaccurate and omitted numerous positive aspects of this prosecutor's performance. Randolph's evaluation resulted in the prosecutor's demotion from Grade II to Grade I.

104.   In December 2008, Ipsen acted as a union steward for the demoted prosecutor and met with Randolph to explain why the prosecutor should be re-evaluated. Additionally, ADDA retained counsel on behalf of the prosecutor. As a result of the efforts by Ipsen, ADDA, and the attorney hired by ADDA, the prosecutor's evaluation was changed from "Not Competent" to "Competent" and the prosecutor being restored to Grade II status with recovery of all of her lost wages that had resulted from her unlawful demotion.

105.   On or about March 4, 2009, Ipsen was handed a letter advising him that he was again being transferred against his wishes, this time to the Compton Court as a calendar deputy. This transfer was Ipsen's second transfer within one year, the normal transfer time being once every FOUR to FIVE years, and was to commence on March 23, 2009. This transfer would result in Ipsen being supervised by Lance Wong, a member of Defendant Cooley's negotiating team which opposes ADDA. This transfer, an act of retaliation against Ipsen, added an additional 20 to 30 minutes to Ipsen's daily one-way commute, and again, constituted "freeway therapy."

106.   At the same time, on March 4, 2009, in a further act of retaliation against Ipsen, two armed DA Investigators again hand delivered a letter to Ipsen notifying him that Defendants had suspended him for two days without pay for alleged

31

**FIRST AMENDED COMPLAINT**

1   misconduct during the meeting Ipsen had with Randolph in December 2008 in which

2   Ipsen acted as union steward, the suspension was scheduled to coincide with Ipsen's

3   "transfer" to Compton Court, in that the two days' suspension were to be served March

4   20 through March 21, 2009, returning Ipsen to work at his "regularly scheduled time"

5   on March 23, 2009 – except that it was at his "new" assignment at Compton Court.

6

7      107.   The allegations Defendants made against Ipsen about his meeting with

8   Randolph were false.  Defendants did not give Ipsen any opportunity to rebut the

9   allegations.  Moreover, Ipsen acted in his capacity as a union steward during the

10   December 2008 meeting.  Accordingly, Ipsen was not subject to employer discipline

11   for his actions during this meeting.  Any objections Defendants had regarding Ipsen's

12   actions as a union steward were required to be handled by filing complaints with

13   ERCOM, not "handled" by armed DA Investigators and illegal suspensions.

14

15      108.   ADDA continued its bargaining process into 2009, however, bargaining

16   ended in April, 2009, because Defendant Cooley's bargaining team admitted it had no

17   authority to agree to any provision which were being discussed, known as "surface

18   bargaining" and because the DA's office was not willing to meet in good faith.

19   ADDA and its Board filed an Unfair Labor Practice charge for this failure to bargain.

20

21      109.   On May 28, 2009, Ipsen examined Robert Dver at an ERCOM

22   administrative proceeding.  It was then that Dver testified publicly, for the first time,

23   about the Union Discrimination Policy that Cooley had revealed to Dver when the two

24

25

26

27

28

**FIRST AMENDED COMPLAINT**

1   met in October 2008.[7] Ipsen followed up on July 9, 2009 with an examination of

2   Defendant Lacey, at which she admitted to the existence of Defendants' Policy.[8]

3

4    110. Less than a week after Lacey's bombshell testimony, Defendants again

5   retaliated against Ipsen by presenting him with a "Needs Improvement" PE rating.

6   This rating was presented in an untimely fashion, and illegally based on Randolph's

7   false allegations relating to Ipsen's intervention in December 2008 on behalf of the

8   Grade II prosecutor that Randolph had falsely maligned.  It was also based upon

9   misleading statements by Nantroup, Ipsen's former supervisor in Antelope Valley and

10  the perpetrator of the *Brady* violation Ipsen and ADDA had previously investigated.[9]

11

12   111. Concurrently with the "needs improvement" rating, which was rife with

13  mischaracterizations and prepared by individuals who were, and are, members of

14  Defendant Cooley's bargaining team, Defendants presented Ipsen with a retaliatory

15  "Plan for Individual Improvement" "PII"to be effective between July 15, 2009 and

16  October 30, 2009.

17

18   112. The "Needs Improvement" PE and accompanying "PII" subjected Ipsen

19  to possible demotion or termination at anytime until October 30, 2009.

20

21

22

23

24

25

26  [7] See *supra*, ¶¶ 31-37.

27  [8] See *supra*, ¶ 39.

28  [9] See *supra*, ¶ 97.

33

**FIRST AMENDED COMPLAINT**

1   113. Defendants issued this PE and implemented the PIP just two days before

2   the beginning of ADDA's campaign to achieve agency shop.[10] Defendants timed the

3   disclosure of Ipsen's false PE to disrupt his ability to campaign for agency shop.

4

5   114. Ipsen advised HDDA Lance Wong that the PE was untimely, did not

6   follow procedure, and requested that the PE process be postponed until after the

7   ADDA agency shop election since Ipsen would be consumed with the election process

8   and would not have sufficient opportunity to prepare a proper response or file

9   grievances to challenge the PE. HDDA Wong denied the request without hesitation,

10  or further inquiry, begging the conclusion that this false and unfounded PE and PII

11  were designed specifically to disrupt Ipsen during the Agency Shop election process.

12

13  115. Throughout the PII period, Ipsen was continually subjected to retaliatory

14  and disparate treatment by his supervisors, including AHD John Gilligan denying

15  Ipsen rights to representation, and to document meetings regarding his progress on the

16  plan; denying Ipsen documentary back-up for his false and unfounded PE by ADA

17  Jacqueline Lacey; requiring Ipsen to perform procedures not required of other DDA's;

18  AHD Gilligan and HDDA Wong accusing Ipsen of substandard performance without

19  being able to cite any specific instances or examples thereof; falsely claiming that

20  Ipsen had been advised of a non-existent "noon calendar" policy and a violation

21  thereof; HDDA Wong falsely accusing Ipsen of improper use of staff resources to

22  assist in pulling files although there is no office policy on use of staff in this manner;

23  and HDDA Wong's bad faith rejection of Ipsen's efforts to exceed expectations by

24  summarily rejecting Ipsen's offer to be available to young DDA's during the lunch

25  break daily and after work to act as a trial adviser; Ipsen's preparation of materials for

26  _____

27  [10] An agency shop election is one in which members of a County bargaining unit vote to

28  determine whether union dues shall become mandatory for all members of the unit.

**FIRST AMENDED COMPLAINT**

1   DDA's as part of a calendar workplan, which were placed in a notebook form to keep

2   important forms and information at the DDA's fingertips, which Wong felt was

3   "contrary to the office's effort to go paperless;" (These notebooks were welcomed by

4   the DDA's who received them and many suggestions for additions thereto were also

5   submitted); and Wong's assertion that Ipsen had "failed" to train DDA's how to use the

6   Red Book tracking procedure for the Calendar Court. (However, later it was

7   determined that there is no policy to use a Red Book Procedure and HDDA Wong

8   instructed Ipsen to teach the young DDA's "whatever method" he used, and Ipsen did

9   so, although to Ipsen's knowledge no other calendar DDA has ever been required to

10   engage in such training activity.)

11

12      116.   Ipsen was assigned to the Compton Branch until approximately October,

13   2009. His supervisor in Compton, Lance Wong, was a member of Defendant

14   Cooley's management negotiating team, the counterpart of ADDA's Contract

15   Negotiating Team. Since Ipsen's transfer to Compton, Wong has been manufacturing

16   grounds that could be used by Defendants to discipline, demote or terminate Ipsen.

17

18      117.   Approximately one week prior to the of Ipsen's Performance

19   Improvement period, near the end of October, 2009, Ipsen was again transferred

20   against his wishes, this time back to Lancaster (Antelope Valley). Ipsen objected to

21   this transfer as another incidence of "freeway therapy" and as a union hardship due to

22   interference with collective bargaining obligations, and other union activities, and as a

23   hardship on Ipsen's family since he has a small child and his spouse works in the West

24   Hollywood area. Due to child care responsibilities, and these additional obligations,

25   Ipsen has continually requested to be near Downtown Los Angeles. Defendants have

26   repeatedly ignored Ipsen's requests, notwithstanding that such requests are routinely

27   considered when making assignments.

28

35

**FIRST AMENDED COMPLAINT**

118.  This punitive and undesirable "transfer" was effected even though Ipsen "passed" his Performance Improvement Evaluation, and was rated "competent" – an evaluation which again, is unjustifiably low, full of inaccuracies and innuendo, retaliatory, and caused Ipsen damages due to the uncertainty of his assignment.

*Defendants' Use of DA Investigators to Gag Media Coverage of ADDA*

119.  Defendants have used DA Investigators to intimidate and harass media outlets that have associated with ADDA and President Ipsen.

120.  One example is the Full Disclosure Network, a cable news program managed by Leslie Dutton, an Emmy-award winning producer.

121.  In late 2006 and early 2007, Dutton attempted to organize a law enforcement training conference at the Bonaventure Hotel in Los Angeles entitled "Gangs, Drugs and Immigration."

122.  In a letter dated March 14, 2007, Los Angeles County Sheriff Lee Baca stated to Dutton that he was "pleased to be a co-sponsor" and further stated that "[i]t is with great enthusiasm that I endorse this project and urge law enforcement personnel to support and attend the conference."

123.  ADDA President Steve Ipsen sent a letter to Dutton on May 23, 2007, stating that ADDA was proud to co-sponsor the conference with Sheriff Baca.

**FIRST AMENDED COMPLAINT**

124.   Shortly thereafter, Dutton e-mailed an announcement regarding the conference to deputy prosecutors in the DA's Office.  This e-mail explained that the sponsors of the conference included ADDA.

125.   On July 5, 2007, two armed DA Investigators showed up unannounced at Dutton's office.  The Investigators repeatedly demanded that Dutton tell them who had given her the e-mail addresses for deputy district attorneys to whom Dutton had e-mailed the conference announcement.

126.   Dutton asked the Investigators why they insisted upon this information. The Investigators responded that the DA Office's computer system needed to be protected from viruses.

127.   When Dutton asked the Investigators if any of the e-mails she sent had contained viruses, they admitted that none had.

128.   Dutton asked if she had done anything illegal in sending the e-mails.  The DA Investigators admitted that nothing illegal had occurred, begging the question of why two armed investigators arrived unannounced at Dutton's office in the first place.

129.   Two weeks after DA Investigators interrogated Dutton, the Los Angeles Sheriff's Department withdrew its support for the conference.  Dutton was forced to cancel it.

37

**FIRST AMENDED COMPLAINT**

1    130.   Plaintiffs are informed, believe, and thereon allege that Defendants

2    pressured the Sheriff's Department to withdraw its support from Dutton's conference

3    due to ADDA's participation in it.[11]

4

5

6    *ADDA Vice President Marc Debbaudt's Background:*

7

8    131.   DDA Marc Debbaudt is Vice President of ADDA and has been since

9    2002.   He currently sits on ADDA's Labor Committee, Litigation Committee,

10   ERCOM committee, and Contract Negotiating Team.

11

12   132.   In Debbaudt's 2009 PE, his supervisor described Debbaudt as "the best

13   calendar deputy I have ever seen in the office."

14

15   133.   Debbaudt's prior supervisors have heaped similar praises on him.  In

16   January 2005, Debbaudt's supervisor in the San Fernando Branch, Beverly Campbell,

17   made these comments in Debbaudt's PE that year:

18

19         Marc is an excellent calendar deputy and is highly regarded by his

20         peers and subordinates as well as the defense bar and bench.  He has

21         won the trust and admiration of his judge as well as the public

22         defenders assigned to his court.  Marc is an excellent mentor and

23         counselor. He has done an outstanding job in maintaining a

24   _____

25   [11] This is not the first time Defendants have used DA Investigators to bully small media outlets.

26   In May 2002, after obtaining an illegal search warrant, Defendants ordered DA Investigators to raid

27   the Los Angeles offices of the *Metropolitan News*.  Their behavior prompted a *Los Angeles Times*
     editorial comparing the DA Investigators who conducted the raid to "thugs" and "vandals."  See The

28   D.A.'s Press Attack, *Los Angeles Times*, May 4, 2002.

**FIRST AMENDED COMPLAINT**

professional atmosphere in his court. The public defenders feel confident that perceived grievances are handled appropriately. Mr. Debbaudt has outstanding interpersonal skills and is extremely approachable. As a result, he routinely solves problems before they become of crisis proportion. He performs well in new situations and does so with a minimum of instructions. However, he seeks guidance when appropriate and communicates potential problems to his supervisors. Judge Taylor is effusive in praising him not only for his calendar management but also for his ability to get along with everyone in the courthouse.  Mr. Debbaudt's legal knowledge, legal reasoning, judgment, and oral and written presentations are excellent. Marc is a team player who willingly tries cases as well as runs a calendar. His calendar management is excellent. He always knows his cases and is well prepared on both the facts and the law.

Mr. Debbaudt is sensitive to the needs of victims and witnesses. He is well liked and has a delightful sense of humor. He can always be depended upon to handle sensitive situations in an appropriate manner.  He is a credit to the office and a pleasure to supervise.

134.   Campbell's successor at the San Fernando Branch, Michael Grosbard, wrote an equally glowing PE in December 2006 regarding Debbaudt's work:

[Debbaudt] possesses a unique combination of intelligence, experience, and common sense that result in excellent judgment. His legal knowledge is extensive and his ability to engage in legal

39

**FIRST AMENDED COMPLAINT**

reasoning is unparalleled. Mr. Debbaudt's calendar is always organized and well prepared.  He provides guidance to the deputies assigned to his court and assigns work in a fair and evenhanded manner. He is cognizant of and adheres to office policy.

Mr. Debbaudt willingly assists in the operation of the office in any way he can. He has a terrific attitude, providing legal advice or personal assistance to anyone who is in need. Mr. Debbaudt supervises the law clerks and legal interns, teaching them how to conduct preliminary hearings, motion writing and otherwise making sure that they have a positive experience here. He is well liked and respected by everyone in this office and by bench officers and defense attorneys as well.

He has the highest ethical standards and conveys the importance of ethical behavior to those he works with and supervises. He is a credit to the legal profession. Mr. Debbaudt fully deserves an outstanding rating.

*Defendants' Acts of Retaliation Against Debbaudt in Violation of His First Amendment Rights of Free Speech and Freedom of Association*

135.   For most of his career with the DA's office, Debbaudt has been vocal about issues of public concern, often voicing opinions, adverse to those of DA Steve Cooley.

**FIRST AMENDED COMPLAINT**

136.  From approximately 1998 through 2008, Debbaudt cohosted the cable public access television show "Public Comment With John Harrold" based in Glendora, California, a broadcast which over the years regularly featured commentary critical of the District Attorney's office, including defendant Cooley's actions and policies. Debbaudt has suffered ongoing retaliation from DA Cooley and his administration as a result of his exercise of his First Amendment Free Speech rights, by speaking out on these issues of public concern.

137.  In or around 2005-2006, Debbaudt discussed as co-host on a cable television show District Attorney Steve Cooley's run for Attorney General and Debbaudt's support for Cooley's opponent, Former Governor Jerry Brown. Following this broadcast Steve Cooley sent Debbaudt a copy of a photograph of Debbaudt and Brown with a handwritten statement by Cooley - which Debbaudt understood as a threat to him for supporting the candidate of his choice.  In each of Cooley's campaigns for District Attorney Debbaudt has also openly discussed and opposed Steve Cooley's candidacy, and supported one of his opponents. Debbaudt's support and association with Cooley's political opponents has resulted in additional retaliation and punitive and adverse employment actions, including adverse transfers, assignments and lowered evaluations.

138.  On or about May 30, 2007, Debbaudt also discussed as co-host, previously undisclosed allegations that Assistant District Attorney Curt Hazel had impregnated a material witness in a Special Circumstance Death Penalty case. Curt Hazel is Steve Cooley's de facto Chief Deputy, who heads the Special Circumstances committee which decides if the DA's office will pursue the Death Penalty in any case. Deputy District Attorney James Bozajian, also an ADDA Board Member, was a guest on the cable access television show and discussed the retaliation he received by

**FIRST AMENDED COMPLAINT**

1   Assistant District Attorney Curt Hazel, when the evidence was revealed. The penalty

2   phase was subsequently overturned due to Hazel withholding material exculpatory

3   evidence from the defense. The effect on this case of Hazel's actions is still unfolding.

4

5       139.   In or around April, 2003, Debbaudt discussed and also wrote a newsletter

6   article, in a publication called "Internal Affairs" which was distributed throughout the

7   DA's Office, that criticized District Attorney Steve Cooley's settlement in a matter

8   involving *Newhall Land and Farming Company*, and an apparent conflict of interest

9   therein, since Newhall was represented by a close friend of Steve Cooley's, Robert

10  Philobosian, a former L.A. County District Attorney, and the godfather of Cooley's

11  children, with whom Cooley owns a cabin. Philobosian achieved a "miracle"

12  settlement of this case, which was also reported upon by other newspapers. Prior to

13  this publication, Defendant Cooley attempted to intimidate Debbaudt and dissuade

14  him from speaking out. Subsequent thereto, Debbaudt has been punished through

15  punitive transfers and lowered evaluations.

16

17

18      140.   During another broadcast, Debbaudt proved up a crime by a former

19  mayor of Glendora and sent a copy of that show and the documentary evidence

20  supporting the crime to the DA's Public Integrity Division. That was over 5 years ago.

21  There has been no response or prosecution. Debbaudt has previously accused Cooley

22  of complicity in covering up corruption in Glendora and has opined that Cooley has

23  misrepresented his dedication to the pursuit of public integrity.

24

25      141.   Debbaudt also commented about the punitive and retaliatory transfer of

26  John Harrold, another ADDA Board member. Harrold was transferred to El Monte.

27  Before that, he was transferred 7 times in a 2 week period to a juvenile assignment

28

42

**FIRST AMENDED COMPLAINT**

clear across the county from his home – another example of "Freeway Therapy." Harrold grieved that transfer, and Debbaudt prepared the grievance. DA Director, Richard Doyle, heard the Grievance (notwithstanding that he was also a subject thereof), lost his composure at the hearing, and threatened to destroy Harrold's career as retaliation for filing the Grievance. The grievance was sustained. Debbaudt continues to be the recipient of retaliation and punishment for supporting this grievance and exposing the DA's office' tactics.

142.    In August, 2009, Debbaudt, publicly criticized Cooley's policy to discourage prosecutors from seeking a third strike for third felonies that are "not violent" – citing as an example the recent Lily Burke murder, which, according to Debbaudt, might have been precluded in 2006 but for a paperwork error which Cooley's office should have caught.

143.    Debbaudt said that LA prosecutors who sought permission to set aside Cooley's approach "risk" being criticized and ignored as he was. Prosecutors who do seek to push Three Strikes are punished with punitive transfers and other adverse employment actions. Following this commentary Debbaudt continues to be subject to punitive assignments, transfers and further retaliation.

144.    Debbaudt has also been an active member of ADDA for most of this decade and has been a vocal supporter of unionizing deputy prosecutors.

145.    In 2004, he was endorsed by ADDA as a candidate who ran unsuccessfully against Los Angeles Superior Court Judge Daniel Oki, the Supervising Judge of the County's Criminal Courts,  due to allegations that Judge Oki had

**FIRST AMENDED COMPLAINT**

1   unlawfully released numerous violent offenders.[12]   Thereafter, Steve Cooley endorsed

2   Judge Oki. the Supervising Judge of the Criminal Courts chose to release in excess of

3   30 criminal defendants after Memorial Day weekend, one of whom thereafter

4   murdered a citizen. Steve Cooley, as District Attorney, remained silent in the face of

5   this tragedy, whereas the ADDA as a Board chose to challenge this judge's dangerous

6   actions. At the encouragement of the ADDA and with their endorsement Debbaudt ran

7   for judicial office against this judge, a personal friend of Cooley's who Cooley

8   decided to endorse despite this unjustifiable and tragic debacle.

9

10       146.   In October 2005 DA Investigators began harassing Debbaudt while

11   ostensibly investigating a complaint that Michael Kraut, an openly gay deputy district

12   attorney in San Fernando, was creating a "hostile work environment."

13

14       147.   Three DA Investigators and a prosecutor interrogated Debbaudt at the

15   San Fernando Police Station regarding the complaint against Kraut.  The interrogation

16   lasted approximately an hour and forty-five minutes.

17

18       148.   Debbaudt's interrogators repeatedly asked Debbaudt how he knew Kraut

19   was gay.

20

21       149.   DA Investigators asked these questions despite knowing that Kraut was

22   openly gay and that his sexual orientation was common knowledge throughout the

23   San Fernando office.

24

25

26

27

28

---

[12]   See, *supra*, ¶¶ 83-84.

44

**FIRST AMENDED COMPLAINT**

1    150.   DA Investigators kept asking Debbaudt *how* Debbaudt knew that Kraut

2    was gay.  From the tone and manner of their questioning, it was clear that DA

3    Investigators were questioning Debbaudt's own sexuality.  Debbaudt, who is

4    heterosexual, finally stated that he had not had sex with Kraut and therefore could not

5    testify from first-hand experience that Kraut was, in fact, gay.

6

7    151.   In July 2007, Debbaudt wrote a letter on ADDA letterhead on behalf of

8    ADDA to unions throughout Los Angeles County asking them to withhold support

9    from Cooley's 2008 campaign for re-election due to Cooley's anti-union actions.

10

11    152.   Subsequently, Defendant Lacey attended one of ADDA's board meetings

12    and said that Steve Cooley had directed her to inquire if Debbaudt had the authority of

13    the ADDA to send the letter.  Thereafter, Defendant Lacey stated that Steve Cooley

14    directed her to investigate the allegations contained in the letter and to discredit

15    Debbaudt and the letter.  She did not explain what authority Defendant Cooley had to

16    use County resources to discredit the political criticisms of Cooley that were contained

17    in the letter.

18

19    153.   During several ADDA meetings in the summer of 2008, Debbaudt

20    repeatedly criticized Defendants' unilateral imposition of a new Performance

21    Evaluation system [PERSA] upon deputy district attorneys, without negotiation with

22    the ADDA.  Debbaudt drafted the unfair labor practices complaint which was filed

23    with ERCOM challenging the legality of these new PE procedures which are a subject

24    of mandatory bargaining.

25

26    154.   In September 2008 Defendants subjected Debbaudt to a punitive transfer

27    as a result of his role in drafting this complaint as well as for other acts taken in his

28

45

**FIRST AMENDED COMPLAINT**

1    capacity as an ADDA member.

2

3        155.   Defendants first decided in September 2008 to transfer Debbaudt to an

4    entry-level position in the East Lake Juvenile Court.

5

6        156.   Juvenile court assignments are almost always filled by inexperienced

7    deputies, not those such as Debbaudt with twenty-plus years of experience and

8    "Outstanding" ratings from supervisors.

9

10       157.   Days later, by October 9, 2008, Defendants decided to transfer Debbaudt

11   to an entry-level assignment in Pomona Juvenile Court, an assignment located 42

12   miles from Debbaudt's home –a long commute is commonly referred to in the District

13   Attorney's office as an act of "freeway therapy."

14

15       158.   Significantly, at this time, ADDA was preparing to enter into its contract

16   negotiations and, similar to Ipsen, Defendants undertook to transfer Debbaudt to an

17   assignment located as far away from downtown Los Angeles – the situs of the

18   bargaining sessions – as possible, in what can only be explained as a deliberate effort

19   to interfere with contract negotiations.

20

21       159.   Defendant Lacey, through her attorney, later admitted that "Mr.

22   Debbaudt was not transferred as part of the usual, normal every couple of months

23   transfer." She also admitted that, though office policy is to transfer deputies based

24   upon the needs of the office, there was no legitimate need in Pomona Juvenile for

25   Debbaudt. She further admitted that Defendant Cooley himself ordered Debbaudt's

26   transfer, that such orders from Steve Cooley were infrequent, and that Debbaudt was

27

28

**FIRST AMENDED COMPLAINT**

1    the only Grade IV deputy district attorney that she was aware of transferred to an

2    entry-level juvenile assignment.

3

4        160.   Debbaudt reported for work in Pomona Juvenile on October 16, 2008.

5    His last day of work there was December 5, 2008, at which time he was scheduled to

6    begin work at Sylmar Juvenile Court on December 8, 2008.  On December 6, 2008

7    Debbaudt severely fractured his right tibia and was on medical leave until February

8    23, 2009, at which time his doctor released him to commence work at Sylmar Juvenile

9    Court.

10

11       161.   Debbaudt's supervisor at Pomona Juvenile Court was Abram Weisbrot.

12

13       162.   In January 2009, Weisbrot issued a PE that rated Debbaudt substantially

14   lower than any of the prior PEs he had received in his 24-year career with the office.

15   For each of the prior 23 years with the County of Los Angeles, Debbaudt received

16   "Outstanding" PEs.  Weisbrot's evaluation reduced Debbaudt's rating by two tiers, to

17   "Meets Expectations."  Defendants provided no explanation for this two-tier

18   downgrade.

19

20       163.   Weisbrot issued this PE after Debbaudt had worked for less than two

21   months in Pomona, despite the fact that (1) Grade IV deputies are almost never issued

22   a PE until they've been in at an assignment for over one year and (2) Debbaudt's

23   supervisor, for whom Debbaudt had served for eight months of the 2008 rating period,

24   described Debbaudt as "the best calendar deputy I have ever seen in the office."

25

26       164.   After Debbaudt spent two months in Pomona Juvenile Court, Defendants

27   transferred him to the Sylmar Juvenile Court in January 2009.

28

47

**FIRST AMENDED COMPLAINT**

1

2      165.   Defendants made this transfer despite the fact that Grade IV

3   deputies such as Debbaudt are normally permitted to stay in a particular assignment

4   for on average approximately three and one half years.  Debbaudt currently remains at

5   his Sylmar Juvenile assignment.

6

7   *Hyatt Seligman's Background*

8

9      166.   Another active ADDA member who has been subject to Defendants'

10   discriminatory policies is Hyatt Seligman, a 30-year veteran of the DA's office and, at

11   all times pertinent to this action, a member of ADDA.

12

13      167.   For much of the first half of his career in the DA's Office, Seligman tried

14   murder cases involving defendants claiming mental disease as a defense.

15

16      168.   Seligman is arguably the most knowledgeable prosecutor in the state on

17   the subject of mental defenses in criminal cases.  He authored the practice guide on

18   mental defenses used by the California District Attorneys Association and distributed

19   to prosecutors throughout the state.

20

21      169.   From 1996 to 2006, Seligman was assigned to the Training Division of

22   the DA's Office.  During that time, he personally trained hundreds of new deputy

23   prosecutors for the office.  Seligman received "Outstanding" ratings during the entire

24   time he was assigned to the Training Division.

25

26      170.   In May 2006, Seligman was assigned to the position of Deputy-In-

27   Charge of the Psychiatric Section of the DA's Office, a unit of the office specializing

28

48

**FIRST AMENDED COMPLAINT**

1  in issues involving competency of defendants to stand trial and extensions of

2  involuntary commitments in state hospitals for mentally disordered offenders found

3  not guilty of crimes by reason of insanity.

4

5  171.  As the Deputy-In-Charge of the Psychiatric Section, Seligman supervised

6  other deputies assigned to the unit. Seligman performed numerous tasks that had not

7  been performed by his predecessor. He consulted, almost on a daily basis, with both

8  of the Superior Court judges assigned to hear psychiatric cases as well as all of his

9  deputies, most of the defense attorneys who specialized in psychiatric cases, and the

10  psychiatrists who routinely testified as expert witnesses.

11

12  172.  Seligman routinely visited mental hospitals run by the California

13  Department of Mental Health. He also visited separately-run juvenile mental health

14  centers and volunteered to speak with sexual offenders and their families. He even

15  donated some of his used suits to a job-interview program established for them.

16

17  173.  He participated in a panel discussion held at Patton Hospital that was

18  televised live to all five state hospitals and all the mental health psychiatrists and

19  technicians and social workers. Seligman consulted with the Hospital's directors and

20  their administrative and treating psychiatrists and provided lectures for their benefit.

21

22  174.  Seligman lectured to psychiatric fellows at USC and cross-examined

23  psychiatric fellows from UCLA in mock training exercises. He also met with officials

24  from the National Association of Mental Illness in order to develop programs that

25  accommodated both the needs of the mentally ill accused of violent felonies while

26  also protecting society from them.

27

28

**FIRST AMENDED COMPLAINT**

1         175.    The DA's Office tasked Seligman with responsibility for reviewing

2   legislative proposals affecting the mentally ill and the criminal justice system.  He

3   provided key input that Governor Arnold Schwarzenegger relied upon in vetoing a

4   poorly drafted bill concerning the establishment of criminal courts devoted to the

5   mentally ill.  Seligman also played a key role in drafting a bill to allow prosecutors to

6   select an expert to examine a defendant who puts his or her mental state at issue in a

7   criminal case.  Governor Schwarzenegger signed this bill, AB 1516, on October 11,

8   2009.

9

10        176.    While at the Psychiatric Section, Seligman volunteered to lecture to

11   deputy prosecutors at the DA's offices throughout the County on how to process and

12   litigate competency and conservatorship issues and the interplay between these issues

13   and issues arising in criminal cases.  He continued training all newly-hired deputies on

14   trial advocacy and other key legal issues and doctrines.  He also regularly lectured to

15   various law enforcement agencies throughout the County on issues such as Confession

16   Law and Search and Seizure.

17

18        177.   During the time he was assigned to Psychiatric Section, Seligman

19   received "Outstanding" ratings from his superiors.

20

21

22   *Defendants' Acts of Retaliation Against Seligman in Violation of His First Amendment*

23   *Rights of Freedom of Speech and Freedom of Association*

24

25   *Seligman's 2008 Punitive Transfer*

26

27

28

50

**FIRST AMENDED COMPLAINT**